UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

CAPAX DISCOVERY, INC., WALKER )
GLOBAL SOLUTIONS NAPLES, INC., )
JOHN BAIOCCO, WYNN HOLDINGS, LLC, )
THOMSON FEDERAL SOLUTIONS, LLC, )
                                    )
          Plaintiffs,               )
                                    )
              v.                    )          Case No. 1:17-cv-00500-CCR
                                    )
AEP RSD INVESTORS, LLC, ZOVY        )
MANAGEMENT LLC, ZOVY INCENTIVE      )
LLC, ALTA EQUITY PARTNERS I         )
MANAGERS, LLC, JESSICA REED,        )
TIMOTHY DIBBLE, TIMOTHY ALEXSON,    )
and GRACE CONNELLY,                 )
                                    )
     Defendants/Counterclaim Plaintiffs, )
                                    )
              v.                    )
                                    )
CAPAX DISCOVERY, INC., and          )
and ANTHONY J. RAGUSA a/k/a TONY    )
WALKER,                             )
                                    )
     Counterclaim Defendants.       )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**
(Docs. 81 & 83)

This case arises out of the acquisition of Zovy LLC ("Zovy") by Plaintiff Capax

Discovery, Inc. ("Capax") in September 2016. In their Amended Verified Complaint,

Plaintiffs Capax, Walker Global Solutions Naples, Inc., John Baiocco, Wynn Holdings,

LLC, and Thomson Federal Solutions, LLC (collectively, "Plaintiffs") seek equitable

rescission of the September 23, 2016 Equity Purchase Agreement (the "EPA") between the parties and assert claims of fraudulent inducement, negligent misrepresentation, and breach of contract. Defendants AEP RSD Investors, LLC ("AEP"), Zovy Management LLC ("Zovy Management"), Zovy Incentive LLC ("Zovy Incentive"), Alta Equity Partners I Managers, LLC ("Alta"), Timothy Dibble, Jessica Reed, Timothy Alexson, and Grace Connelly (collectively, "Defendants") counterclaim for breach of contract against Capax and libel against Capax and Anthony Ragusa, one of Capax's principals.

Pending before the court are cross-motions for summary judgment. Defendants seek summary judgment as a matter of law with regard to each of Plaintiffs' claims and Defendants' breach of contract counterclaim or, in the alternative, summary judgment that Defendants' liability is capped at $300,000 by the terms of the EPA. (Doc. 81.) Plaintiffs cross-move for partial summary judgment on Defendants' libel counterclaim. (Doc. 83.) On March 2, 2020, the court heard oral argument on the pending motions, at which time it took them under advisement.

Plaintiffs are represented by Anthony Rafael Faraco, Esq., Benjamin D. Burge, Esq., and James J. Graber, Esq. Defendants are represented by Brian James Wheelin, Esq., Joseph L. Clasen, Esq., Sandra Marin Lautier, Esq., and Patrick W. Begos, Esq.

I.      **The Undisputed Facts.**

A.      **The Parties.**

Zovy is a software company offering products and services to support "the compilation and storage of, among other things, large amounts of data from email systems." (Doc. 21 at 5, ¶ 17.) Prior to the transaction at issue in this case, Zovy was owned by Alta, a private equity firm, through AEP, and two LLCs, Zovy Management and Zovy Incentive (together with AEP, "Zovy's Members"). Christopher Grossman served as Zovy's Chief Executive Officer ("CEO") from 2014 to September 2016 and as Zovy's president from September 2016 through approximately late October 2018.

Capax offers archiving and information management services similar to Zovy's services. Counterclaim Defendant Anthony Ragusa is a principal of Capax, and Plaintiff

John Baiocco is a minority partner of Capax. Capax's Chief Operating Officer ("COO") is Michael McGrath.

In or around June 2016, Mr. Grossman, in his capacity as Zovy's CEO, contacted Plaintiff Baiocco to propose that Capax and Zovy either form a partnership or, alternatively, that Capax acquire Zovy. Capax was "interested in working with" Zovy because it knew Zovy had a "highly profitable contract" with the United States Department of Veterans Affairs (the "VA"). (Doc. 81-2 at 3, ¶ 15.) Zovy provided Capax with information and business records in anticipation of a potential transaction, including a copy of a contract with Chicago Bridge & Iron ("CB&I") whereby Zovy agreed to provide data migration and other services (the "CB&I Contract"). Capax also received copies of all of Zovy's existing VA contracts.

### B.    The EPA.

On September 23, 2016, the parties executed the EPA, which provided that in exchange for acquiring Zovy, Capax would pay a purchase price of one dollar plus "additional contingent consideration [the 'Earn-out Consideration'] of fifty percent [50%] of the annual gross . . . VA Revenue" in excess of $1 million for calendar years 2016 and 2017 and in excess of $1.5 million for calendar years 2018, 2019, and 2020. (Doc. 88-4 at 6, § 2.4.1) (brackets in original). "VA Revenue" is defined by the EPA as annual gross revenue actually received under VA contract number NNG15SD26B. *Id.* Pursuant to the EPA, Zovy's Members are entitled to receive earn-out payments within fifteen days of receipt of VA Revenue and thus were supposed to receive earn-out compensation within fifteen days of a November 17, 2016 VA payment. Plaintiffs admit that they have paid no earn-out compensation to date.

In the EPA, Zovy's Members represented that:

[Zovy] does not have any liabilities or obligations that would reasonably be expected to have a Material Adverse Effect on [Zovy], the Business, or the assets of [Zovy], except those set forth or adequately reserved against on the balance sheets contained in the Financial Statements [or disclosed in the notes thereto], other than those incurred in the ordinary course of business and in a manner consistent with past practices and those not required to be

3

> reflected on a balance sheet in accordance with GAAP [Generally Accepted
> Accounting Principles].

*Id.* at 12, § 5.9 (fourth brackets in original).

Section 8.2 of the EPA provides, among other things, that Zovy's Members will indemnify Capax and Zovy for costs "resulting from or arising out of or in connection with or relating to . . . any inaccuracy or breach of any representation or warranty of such Member contained in Articles IV or V[.]" *Id.* at 23, § 8.2. In addition, the EPA caps Zovy's Members' liability in certain circumstances, providing that "[e]xcept with respect to a breach by a Member of a Fundamental Representation, the aggregate liability of the Members under Section 8.2 shall not exceed $300,000[.]" *Id.* at 25, § 8.9.2.

The EPA contains a merger clause which provides:

> This Agreement, including the Disclosure Statement schedules and exhibits
> hereto, and the instruments and other documents delivered pursuant to this
> Agreement, contain the entire understanding and agreement of the parties
> relating to the subject matter hereof and supersedes all prior and/or
> contemporaneous understandings and agreements of any kind and nature
> [whether written or oral] among the parties with respect to such subject
> matter, all of which are merged herein.

*Id.* at 26, § 9.4 (brackets in original).

**C.      Due Diligence by Capax.**

Three days after the Zovy acquisition, Counterclaim Defendant Ragusa disseminated a meeting agenda for Capax's upcoming fall conference in which he described the Zovy acquisition as "a shot in the dark[.]" (Doc. 81-2 at 7, ¶ 30.) He further stated:

> The reason we accelerated the closing process without due diligence is
> because of the immediate cash flow benefit we expect to receive over the
> next [sixty] days, especially from the VA. Unfortunately, we have no idea
> of the problems and risks we are inheriting[.]

*Id.* Ultimately, post-acquisition, Zovy realized a gross profit in excess of three million dollars and had a substantial net income in 2017 and was profitable in 2018 as well. *See id.* at 7, ¶¶ 32, 35.

### D.     Alleged Delay of Payment.

After the Zovy acquisition, Capax awaited payments from the VA, the timing of which would, in turn, affect the earn-out compensation Capax owed to the Zovy Members under the EPA. In a transcript of messages sent between Capax's COO, Mr. McGrath, and Plaintiff Baiocco on November 30, 2016, Mr. McGrath asked about the status of the "770k va gig[,]" writing, "We don't want them to pay until 1/1/17 though to start the clock on the earn-out again[.]" (Doc. 81-5 at 6.) Mr. McGrath also stated, "[W]e're just doing this to mess with Alta[.]" *Id.*[1]

A third-party vendor, Thundercat Technologies, LLC ("Thundercat") managed the VA's account relationship with Zovy, including the payment of invoices. On December 12, 2016, Mr. McGrath, on behalf of Capax, sent an email to Zovy employee Alexandra MacMurchie with the following message:

> We have the $770k Thundercat invoice ready to send, but have been holding as we'd prefer payment to happen after 12/31/16.

> If we send the invoice now, do you have enough sway with Thundercat to ensure we don't get paid until 2017?

(Doc. 81-5 at 9.) Ms. MacMurchie responded, "yes[,] I can make that happen[.]" *Id.* Mr. McGrath replied, "I'll have the invoice sent out tonight/tomorrow morning then." *Id.* Thundercat ultimately paid the invoice on behalf of the VA on January 13, 2017.

At his deposition, Mr. McGrath explained that he wanted to "mess with Alta" based on his "review of the closing financial statements" in which he testified that he found "[m]isrepresentations of Zovy's financial statements." (Doc. 81-10 at 3-4.) He further testified:

> Q.     And you took efforts to make sure that the VA did not pay an invoice that was due at the end of 2016 until 2017, correct?

> A.     Yes.

> Q.     That was an invoice in the amount of $770,000, correct?

> A.     Yes.

*Id.* at 5.

---

[1] Pre-acquisition, Alta was a part owner of Zovy.

Approximately one year later, in a December 14, 2017 email, Ms. MacMurchie notified Mr. McGrath that "Thunder[c]at [was] anxious for their invoice." (Doc. 94-2 at 2.) Mr. McGrath responded that the "wrong PO was referenced" on the invoice and that he "may not get th[e] invoice out th[at] week." *Id.* On December 20, 2017, a Thundercat program manager requested the invoice again and noted, "We need to invoice the VA ASAP, but can't until [Zovy's] invoice is received." (Doc. 94-3 at 2.) On January 3, 2018, a Thundercat employee informed Zovy that "although th[e] invoice is dated 12/7/17, we did not receive the invoice until 1/2/18." (Doc. 94-4 at 2.)

Mr. McGrath addressed the December 2017 invoice to the VA in his deposition testimony as follows:

> Q. And are you saying here today that you don't know why it happened to take from December 14, 2017 to January 2nd, 2018 to send out the invoice?
>
> A. Part of it was certainly to make sure that it was correct, to make sure that we got it to them and all of the information was correct. And also a portion of it was to have the VA earn-out recalculate if the cash came in the next year, absolutely.

(Doc. 81-10 at 6.)

**E.    Capax's Fraud Alert.**

"[O]n or around July 24, 2018," Counterclaim Defendant Ragusa disseminated a "Fraud Alert" using his LinkedIn account. (Doc. 83-1 at 2, ¶ 3.) The Fraud Alert included quotations from the pleadings in this case as well as the following statements:

> Timothy Dibble and Jessica Reed remain personally liable for fraud.
>
> We are continuing to investigate allegations regarding Timothy Dibble and Jessica Reed, who were named personally for fraud in Capax Discovery's complaint. Although Dibble and Reed attempted to have themselves personally removed from the complaint, the judge denied their request. They remain personally as a defendant with no corporate shield to protect them from their role in this alleged fraud.
>
> Chances are you may well be a victim of fraud.

(Doc. 83-4.)

At his deposition, Counterclaim Defendant Ragusa could not recall the specific parties to whom he sent the Fraud Alert, but testified that he sent the message to "less than [twelve]" recipients that he identified using Alta's website. (Doc. 86-3 at 5-6.) No recipients of the Fraud Alert responded to Plaintiffs. Defendants "are not aware of, to date, a specific lost business opportunity as a result of the Fraud Alert." (Doc. 86-1 at 2, ¶ 5.)

## II.   The Disputed Facts.

### A.   Statements by Counterclaim Defendant Ragusa.

Plaintiffs do not challenge Defendants' quotation of the September 26, 2016 conference agenda that refers to the completion of the Zovy transaction "without due diligence[.]" (Doc. 81-2 at 7, ¶ 30.) Nonetheless, they dispute the accuracy of that statement, claiming that Plaintiffs engaged in some due diligence prior to acquiring Zovy and citing Counterclaim Defendant Ragusa's inconsistent deposition testimony that Capax was "going through due diligence so I think it was inaccurate that I stated without due diligence." (Doc. 88-26 at 3.)

### B.   Zovy's Financial Condition.

Plaintiffs do not dispute that Zovy was profitable in 2017 and 2018, however, they point out that although Zovy's 2017 audited financial statements show it distributed $2,446,996 to Zovy's Members that year, those distributions must be considered in the context of Zovy's $2,402,168 liability for advances paid by Zovy's Members as of December 31, 2017, representing "the amount the [M]embers lent to Zovy." (Doc. 88-2 at 5, ¶ 33.) In a "2017 Strategy Report" dated May 7, 2017, Counterclaim Defendant Ragusa wrote that Zovy "hope[d] to demonstrate profits somewhere between $4.5[ million] to $6[ million][,]" which "would put the Zovy valuation at somewhere between $27[ million]-$60[ million][.]" (Doc. 81-5 at 36.) Plaintiffs note that the same paragraph of the report states that Zovy's earnings "will also include the profitability of our HPCA and Nearpoint legacy accounts." *Id.* They cite Counterclaim Defendant Ragusa's deposition testimony that: "We had a significant asset, HPCA, and I felt that even though Zovy was worthless, combined with HPCA that we could create significant

value" but that "as a standalone company without HPCA, it was indeed worthless." (Doc. 88-2 at 5-6, ¶ 36.) Because the portion of Counterclaim Defendant Ragusa's deposition which Plaintiffs cite has not been submitted, the court cannot consider the statements cited therein. *See* L. R. 56(a)(3) (requiring all cited evidence, including deposition testimony, to be submitted as an appendix to a party's statement of facts in support of or opposition to a motion for summary judgment). Examining the facts in the light most favorable to the non-moving party, it remains undisputed that post-acquisition Zovy was profitable.

**C.     The Term of the CB&I Contract.**

The parties dispute whether Mr. Grossman, Zovy's CEO, represented that the CB&I Contract was subject to renewal or continuation beyond a one-year term. Plaintiffs contend that Defendants falsely represented that Zovy's agreement with CB&I was "'ongoing' or multi-year" and would produce recurring revenue. (Doc. 88-2 at 6, ¶ 47.) An internal Alta memorandum dated May 31, 2016 states that "Westinghouse was required to enter into a new contract with Zovy to migrate [CB&I's] data and also signed a contract for continued [Software as a Service] for the division for two years." (Doc. 88-10 at 5.) On August 23, 2016, Mr. Grossman emailed Capax's COO, Mr. McGrath, regarding the CB&I Contract and explained, "[i]n this case like we do in many of our deals we took a much reduced cost to put it all as a reoccurring deal." (Doc. 81-5 at 64.) Mr. Grossman further noted:

> This is our one contract that does allow the customer to get their data back but it forces them to have an **active contract as we return the data.** The data return process at this size would be 14-18 months so the minimum amount of time this contract could practically be ended would be May 2018.

*Id.* (emphasis in original).

At his deposition, Mr. Grossman testified that the CB&I Contract had a one-year term but that Zovy "had every reason to believe that the contract would be ongoing after this first year because the data was being migrated to a proprietary repository where the data would reside." (Doc. 81-11 at 8, 10.) The CB&I Contract provides that:

> Upon written request and authorization by CB&I (and as limited to such
> data as CB&I may specify and as technically possible), [Zovy shall] extend
> CB&I's license to the Zovy Archive to permit Westinghouse Electric
> Company, LLC or its affiliates or related parties to access CB&I's Zovy
> Archive (or defined portions thereof) with as many user licenses as CB&I
> may request during the period of June 1st, 2016 – May 30th, 2017.

(Doc. 81-5 at 46.)

**D.     Liability to HP Under the CB&I Contract.**

Plaintiffs assert Defendants failed to disclose Zovy's obligation under the CB&I

Contract to cover costs owed by CB&I to the Hewlett-Packard Company ("HP") and

represented there would be "no deletion cost[.]" (Doc. 88-2 at 11, ¶ 85.) In her deposition

on May 31, 2019, Defendant Reed, a member of Alta, testified that Zovy's CEO, Mr.

Grossman,

> had represented that there would be no data deletion cost, and so the cost of
> that contract was related to getting data from HP, but that the deletion
> wouldn't be something that would have to be paid for. And so that's how
> we represented it, but we didn't have anything specific to indicate in
> writing that there would be no data deletion cost.

(Doc. 88-6 at 7-8.)

In an affidavit dated October 22, 2019, Defendant Reed stated that "Zovy did

project the HP costs and disclosed them to Capax prior to the [a]cquisition" by providing

Capax with invoices from HP and Zovy's financial statements, which showed an aging

accounts payable entry for HP in the amount of $63,368.67. (Doc. 81-4 at 4, ¶ 18.)

Ms. Reed further affirmed that Zovy "advised Capax to expect future costs going

forward[,]" *id.* at ¶ 19, as reflected by an increased monthly cost of goods sold on Zovy's

projected profit and loss statements provided to representatives of Capax.

An invoice dated July 29, 2016 from Hewlett Packard Enterprise addressed to

CB&I reflects an outstanding balance of $24,918.61 (Doc. 88-22.) A second invoice from

Hewlett Packard Enterprise to CB&I dated August 25, 2016 shows a balance of $27,000.

(Doc. 88-23.) An undated invoice sent from Hewlett-Packard Financial Services

Company to Zovy lists $11,376.14 in charges due on September 1, 2016 (Doc. 88-24),

and a second undated invoice from Hewlett-Packard Financial Services Company marked

"posted" September 21, 2016 lists a "[l]ate payment fee . . . for the period" of September 2, 2016 to September 14, 2016 of $73.94. (Doc. 88-25.) Plaintiffs assert that these invoices reveal that Defendants failed to disclose the expected liability to HP because the amounts listed on the invoices do not equal, either separately or in combination, the costs Defendants claim they projected.

The CB&I Contract provides:

> Zovy shall, based upon Zovy's existing, separate agreement with HP, ensure that CB&I shall no longer be contractually or otherwise obligated to pay to HP any fees not already accrued, including, without limitation, any further fee for Data Safe Archiving Services, Data Deletion Services, Data Migration Services, Data Restoration Services, or Data Return Services, unless such agreement is entered into between CB&I and HP after this Proposal is executed.

(Doc. 81-5 at 46.) Pursuant to this provision, Zovy promised to assure that CB&I's obligation to pay fees to HP related to data safe archiving, data deletion, data migration, data restoration, and data return services would either cease or would be reflected in a new agreement.

### E.     Ownership of Hardware Located at the VA.

Plaintiffs claim that Defendants inaccurately reported Zovy's fixed assets in the 2015 financial statements to include certain hardware owned by the VA. In their Amended Verified Complaint, Plaintiffs allege that "the $167,156 attributed to [VA] hardware . . . was misrepresented as an asset of [Zovy]" because "hardware deployed at the VA is not an asset of Zovy[.]" (Doc. 21 at 12-13, ¶ 40.A.) Prior to acquisition, Plaintiffs were provided with two profit and loss financial documents for the terms of January through December 2015 and January through May 2016. (Doc. 81-5 at 112-14.) The statement for January through December 2015 records as income "Sales - Hardware" in the value of $60,000. *Id.* at 112. The words "hardware" and "VA" do not appear on the statement for January through May 2016. *Id.* at 114. A "Detailed Depreciation S[c]hedule" provided to Plaintiffs includes three line items with an "Asset ID" of "ZOVY HW" and a "Location ID" of "VA hardware[.]" (Doc. 88-14 at 3.) The acquisition date for all three items is September 30, 2016. The acquisition costs of the three line items are

$46,296, $60,000, and $60,860, respectively, totaling $167,156. It is undisputed that the "Detailed Depreciation S[c]hedule" was provided to Plaintiffs only after they had acquired Zovy.

Defendants concede that "hardware provided by Zovy that is located at the VA could not be recovered by Zovy," (Doc. 81-1 at 21). In an August 13, 2015 email to a Thundercat employee, Mr. Grossman wrote that "[a]ll hardware will be property of the VA and will be supported and maintained by Zovy." (Doc. 88-15 at 1.) It is therefore undisputed that the VA owned certain hardware. It is also undisputed that the only Zovy financial records that mention the VA hardware and purport to show that it was owned by Zovy were received by Plaintiffs only *after* the Zovy acquisition was finalized.

F.    **Amounts Included in Accounts Receivable.**

Plaintiffs dispute whether Defendants disclosed all "held" invoices generated prior to the closing of the EPA and improperly represented amounts that were not yet invoiced as accounts receivable. They contend these alleged practices artificially inflated Zovy's value.

On September 26, 2016, Mr. Grossman emailed Defendants Tim Alexson and Grace Connelly and requested "the final invoices we sent to the clients and if we did send them. These are the ones listed in the A[ccounts]/R[eceivable] report and that we emailed back and forth." (Doc. 88-16.) Defendant Alexson replied: "Here are the invoices that were generated prior to the close. We were advised not to send to clients yet." *Id.* At his deposition, Capax's COO, Mr. McGrath, testified that the invoices were for "work that had yet to be performed" and "in most cases work that had yet to be contracted." (Doc. 88-5 at 6.)[2] Mr. McGrath further stated in his deposition:

---

[2] The September 26, 2016 email from Mr. Alexson lists Zovy Invoices 151074, 151075, 151076, 151077, 151078, 151079, 151080, and 151081 as attachments. Zovy Invoice 151074, dated August 15, 2016, is addressed to CB&I Federal Services LLC and includes a line item for "[s]ubscription dates September 30, 2016 through September 29, 2017[.]" (Doc. 88-17.) Zovy Invoice 151077, dated August 3, 2016, is addressed to Brouse McDowell and contains a single line item for data migration with no term of service. (Doc. 88-18.) Zovy Invoice 151078, dated August 31, 2016, is addressed to Redstone Federal Credit Union and lists "[s]ubscription dates 11/10/2016 to 11/9/2017[.]" (Doc. 88-19.) Zovy Invoice 151079, also dated August 31, 2016, is

Q.    Now, am I right that all of these invoices, except for the ones regarding UT Health, were paid?

A.    I believe so, yes.

Because Plaintiffs do not dispute that the invoices in question with the exception of those pertaining to UT Health were paid after the Zovy acquisition, the only issue is whether Defendants' inclusion of invoices that had not yet been sent out in Zovy's Accounts Receivable caused Plaintiffs to suffer a compensable injury.

## III.    Conclusions of Law & Analysis.

### A.    Standard of Review.

A party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law" are material to the court's determination. *Id.*

At the summary judgment stage, the nonmoving party is entitled to "the benefit of all permissible inferences and all credibility assessments[.]" *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016). "Where parties file cross-motions for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks, alterations, and citation omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes

---

addressed to La Roche College and includes three charges, each for the period from "September 30, 2016 through September 29, 2017[.]" (Doc. 88-20.) Zovy Invoice 151080, dated August 31, 2016, is addressed to Pachulski Stang Ziehl Young & Jones P.C. and does not contain any service period in the balance description. (Doc. 88-21.) Plaintiffs did not submit copies of Zovy Invoices 151075, 151076, and 151081.

demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, its opponent must show that there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict" in its favor. *Anderson*, 477 U.S. at 249. However, in opposing summary judgment, a party may not "rest upon the mere allegations or denials of the adverse party's pleading," *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006), nor "simply . . . assert[] a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact" but to "determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

In this case, although certain material facts are disputed, they do not preclude summary judgment if a party cannot otherwise prove its claims. In other words, the presence of disputed issues of fact will not preclude summary judgment if the moving party can establish that regardless of how that factual issue is resolved, the party that has the burden of proof at trial has not proffered admissible evidence in support of each essential element of its claim. *See Catrett*, 477 U.S. at 322 (holding summary judgment is mandated against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case"); *see also El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial") (internal quotation marks and citation omitted).

**B.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Claim for Equitable Rescission of the EPA.**

Defendants seek summary judgment on Plaintiffs' equitable rescission claim as Plaintiffs have repeatedly represented that the claim was made in error and that they do not intend to pursue it. In their brief, Plaintiffs "stipulate to withdraw" the equitable rescission claim (Doc. 88 at 18), and they confirmed their intent to withdraw the claim at oral argument. Plaintiffs' request for equitable rescission in the Amended Verified Complaint's First Cause of Action is therefore WITHDRAWN and Defendants' motion for summary judgment on that claim is DENIED AS MOOT.

**C.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claims.**

**1.    Whether Plaintiffs Have Abandoned Their Compliance with GAAP Breach of Contract Claim.**

In their Amended Verified Complaint, Plaintiffs assert that Defendants failed to perform under § 5.9 of the EPA by misrepresenting Zovy's obligations to HP under the CB&I Contract and by failing to prepare financial documents in compliance with GAAP. Plaintiffs further claim that Defendants' alleged noncompliance excuses their own nonperformance. In responding to Defendants' motion for summary judgment, however, Plaintiffs do not proffer evidence in support of their claim that they suffered an injury as a result of Zovy's alleged noncompliance with GAAP. "[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014). Because Plaintiffs have failed to support their GAAP-based breach of contract claim with admissible evidence, Defendants' motion for summary judgment as to that claim is GRANTED.

**2.    Whether Plaintiffs' Nonperformance Negates a Breach of Contract Claim.**

Defendants seek summary judgment on Plaintiffs' remaining breach of contract claims, arguing that Plaintiffs' own nonperformance under the EPA precludes them from prevailing on their breach of contract claim. Under New York law, a party seeking to

14

recover for breach of contract must establish "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citations omitted).

"[O]ne of the essential elements of a cause of action for breach of contract is the performance of its obligations by the party asserting the cause of action for breach[.]" *Cty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 206 (App. Div. 2017). "It is well settled that 'a party who seeks to recover damages from the other party to the contract for its breach must show that he himself is free from fault in respect of performance[.]" *Id.* "The issue of whether a party has substantially performed is usually a question of fact", however, the issue may be decided as a matter of law "where the inferences are certain." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). "[F]ailure to tender payment is generally deemed a material breach of a contract." *ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991).

It is undisputed that Plaintiffs have not paid any portion of the earn-out consideration contemplated by the EPA even though the plain language of the EPA required Plaintiffs to pay Zovy's Members earn-out compensation within fifteen days of a November 17, 2016 payment made by the VA to Zovy. Plaintiffs contend that they are excused from performance under the EPA because Defendants materially breached the contract by making certain material misrepresentations and non-disclosures. "When a party materially breaches a contract, the nonbreaching party may choose to continue to perform on the contract, or it may elect to terminate the agreement." *Marathon Enters., Inc. v. Schroter GMBH & Co.*, 2003 WL 355238, at *6 (S.D.N.Y. Feb. 18, 1995) (citing *Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*, 901 F. Supp. 133, 136 (S.D.N.Y. 1995). It may not, however, do both. Plaintiffs do not seek rescission of the EPA because that would require them to return Zovy's assets. *See Ferguson v. Lion Holdings, Inc.*, 312 F. Supp. 2d 484, 499 (S.D.N.Y. 2004) (holding that "a party seeking rescission of a contract must tender the return of consideration it received pursuant to the voidable contract"). They may sue for breach of contract, but only if they have performed

themselves. In essence, Plaintiffs seek to retain Defendants' consideration and sue for damages without paying any consideration for what they have received. They cite no authority in support of this unusual proposition, and the court has found none.

Because Plaintiffs have failed to perform under the EPA, they cannot bring a breach of contract claim as a matter of law. *See Pui Sang Lai v. Shuk Yim Lau*, 855 N.Y.S.2d 615, 617 (App. Div. 2008) (holding that where "plaintiffs failed to perform any of their obligations under the agreement . . . the agreement was unenforceable"). Defendants' motion for summary judgment on Plaintiffs' breach of contract claim is therefore GRANTED and Plaintiffs' breach of contract claim (Count IV) is DISMISSED.

### D.   Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Negligent Misrepresentation Claim.

Defendants seek summary judgment on Plaintiffs' negligent misrepresentation claim, arguing that Plaintiffs cannot show the existence of a special relationship between the parties. To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must establish "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

A special relationship that imposes a duty to provide correct information "may be established by 'persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified[.]'" *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011) (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996)). For example, "[p]rofessionals, such as lawyers and engineers," may form special relationships with their clients "by virtue of their training and expertise[.]" *Kimmell*, 675 N.E.2d at 454. "In the commercial context, a duty to speak with care exists

when the relationship of the parties, arising out of contract or otherwise," gives the receiving party a justifiable right to rely on the information provided. *Id.* (internal quotation marks omitted.)

"Generally . . . an arm's-length business relationship between sophisticated parties will not give rise to a confidential or fiduciary relationship that would support a cause of action for negligent misrepresentation[.]" *J.P. Morgan Sec. Inc. v. Ader*, 9 N.Y.S.3d 181, 183 (App. Div. 2015). Moreover, "[t]hat a defendant knew in general that prospective commercial participants would rely on its statements is insufficient to establish a special relationship." *Ramiro Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 287-88 (S.D.N.Y. 2019) (internal quotation marks, alteration, and citation omitted). As a result, where "the parties on both sides" of a transaction "were operating independently, with no prior existing relationship and with no reason to repose trust in the other[,]" a special relationship does not exist. *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011).

This court previously dismissed Plaintiffs' negligent misrepresentation claim, finding they "ha[d] not alleged a special relationship" as required under New York law. (Doc. 20 at 15.) Plaintiffs subsequently amended their complaint and now contend that there was "actual privity of contract" between the parties. (Doc. 88 at 25.) Privity of contract, however, does not alone create a special relationship because where "the parties to the agreement[] dealt at arm's length, . . . the close relationship required to support the negligent misrepresentation claim [is] lacking[.]" *Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC*, 905 N.Y.S.2d 152, 153 (N.Y. App. Div. 2010).

Plaintiffs further assert that Defendants occupied a "special position of confidence and trust" because they "uniquely had access to all" Zovy's financial and business information Plaintiffs requested in preparing for the acquisition. (Doc. 88 at 25.) This argument is also unavailing because, under New York law, "the mere fact that a defendant possesses certain documentation relating to a transaction" does not give rise to a special relationship by virtue of that party's "special expertise[.]" *Amusement Indus., Inc.*, 786 F. Supp. 2d at 779 (internal quotation marks omitted); *see also MBIA Ins. Co. v.*

17

*GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Gen. Term 2010) ("[C]ourts have not found specialized knowledge where the alleged area of expertise involves the particulars of the defendant's business.").

"Where no triable issue of fact as to the 'special relationship' element exists, summary judgment on [a] negligent misrepresentation claim is appropriate." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 500 (S.D.N.Y. 2018) (internal alteration and citation omitted). Because Plaintiffs have failed to identify any genuine dispute of material fact regarding whether they had a special relationship with Defendants, Defendants' motion for summary judgment on Plaintiffs' claim for negligent misrepresentation (Count III) is GRANTED.

> **E.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fraudulent Inducement Claim.**

In their Amended Verified Complaint, Plaintiffs' fraudulent inducement claim is comprised of eight subparts. In responding to Defendants' motion for summary judgment, Plaintiffs do not address Defendants' arguments regarding four of the asserted misrepresentations: (1) Zovy's obligation to provide new hardware to the VA; (2) The nature of software licenses held by the VA; (3) The inclusion of developed technology as an asset in Zovy's financial statements; and (4) The status of Zovy's relationship with client UT Health. At oral argument, Plaintiffs confirmed that they do not intend to pursue their claims based on those alleged misrepresentations. Defendants' motion for summary judgment as to Plaintiffs' fraudulent inducement claim based on the four abandoned claims is therefore GRANTED.

Defendants seek dismissal of the remainder of Plaintiffs' claims of fraudulent inducement based on: (1) The term length of the CB&I Contract; (2) Ownership of hardware located at the VA; (3) The value of Zovy's outstanding accounts receivable; and (4) Zovy's liability to HP under the CB&I Contract.

Under New York law, a plaintiff alleging fraudulent inducement must show by clear and convincing evidence that there exists "a material misrepresentation or omission of fact[,]" "made by defendant with knowledge of its falsity . . . and intent to defraud[,]"

"reasonable reliance on the part of the plaintiff[,]" and "resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Defendants seek summary judgment based on Plaintiffs' failure to establish one or more essential elements of their remaining fraudulent inducement claims.

### 1.    The Term of the CB&I Contract.

Plaintiffs assert that Defendants misrepresented the term of the CB&I Contract as a recurring or otherwise ongoing contract when in fact it was only for a one-year term. In support of this claim, Plaintiffs contend that Mr. Grossman made oral representations that the CB&I Contract "was an ongoing contract, that it was going to be recurring revenue going forward[,]" (Doc. 88-9 at 3) and that "renewals had already been negotiated" beyond a one-year period. (Doc. 88-5 at 4.) Plaintiffs also cite the purportedly inaccurate May 31, 2016 internal Alta memorandum in which Alta reported that Westinghouse "was required to enter into a new contract with Zovy to migrate [CB&I's] data and also signed a contract for continued [Software as a Service] for the division for two years." (Doc. 88-10 at 5.) According to Plaintiffs, this statement, while not directed to them, supports their claim that Defendants represented that the CB&I Contract would be a recurring source of revenue. There is no evidence that Plaintiffs possessed the Alta memorandum prior to their acquisition of Zovy. Plaintiffs nonetheless assert that their reliance on the statements contained therein was reasonable because the CB&I Contract itself did not contain a durational term.

Defendants counter that Plaintiffs' reliance was not reasonable because Plaintiffs possessed the CB&I Contract prior to acquisition and thus were aware that under that agreement Zovy was required to provide CB&I "with as many user licenses as CB&I may request during the period of June 1st, 2016 – May 30th, 2017." (Doc. 81-5 at 46.) Thus, contrary to Plaintiffs' contention, the CB&I Contract clearly contains a term. Defendants further contend that even if Plaintiffs reasonably relied on statements made by Mr. Grossman, such statements were not material misrepresentations because they represented his beliefs about a future event, rather than actionable statements of present fact. *See LiDestri Foods, Inc. v. 7-Eleven, Inc.*, 2018 WL 1428250, at *7 (W.D.N.Y. Mar.

22, 2018) (noting that the subject of a fraudulent misrepresentation claim must be "factual and not merely promissory or related to future events"). Finally, Defendants contend that Plaintiffs have failed to proffer evidence of damages because Plaintiffs are seeking lost profits, which are not recoverable under New York law.

Under New York law, courts should be "skeptical of claims of reliance asserted by sophisticated businessmen engaged in major transactions [who] enjoy access to critical information but fail to take advantage of that access." *Merrill Lynch*, 500 F.3d at 181 (internal quotation marks omitted) (alteration in original). Where, as here, a party claims to have relied on "alleged oral promises[] which directly contradict the terms of" an agreement in the party's possession, that reliance is "unreasonable as a matter of law." *Morrissey v. Gen. Motors Corp.*, 21 F. App'x 70, 73 (2d Cir. 2001). Because Plaintiffs were in possession of the CB&I Contract prior to acquisition, their reliance on oral statements made by Mr. Grossman and an internal Alta memorandum they apparently did not receive pre-acquisition was not reasonable as a matter of law. This conclusion is underscored by the EPA's merger clause, which states in relevant part that the EPA "contain[s] the entire understanding and agreement of the parties relating to the subject matter hereof and supersedes all prior and/or contemporaneous understandings and agreements of any kind[.]" (Doc. 88-4 at 26, § 9.4); *see Robinson v. Duetsche Bank Tr. Co. Ams.*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008) (finding that New York courts are more reluctant to "consider a plaintiff's reliance upon oral communications reasonable" where the contract "contains a merger clause and where the plaintiff is a sophisticated party").

Plaintiffs' fraudulent inducement claim based on the CB&I Contract fails for the further reason that they do not establish damages by clear and convincing evidence. Although Plaintiffs argue that "a multi-year contract valued at $1.375 million per year would significantly improve the projected future financial performance of Zovy," (Doc. 88 at 21), under New York law damages for fraudulent inducement "are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained . . . [and] there can be no recovery of profits which

would have been realized in the absence of fraud[.]" *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1373-74 (N.Y. 1996) (citations omitted). For this reason, Plaintiffs cannot recover profits they expected to make from the CB&I Contract had it been subject to automatic renewal. Instead, New York follows the "out-of-pocket" rule which allows a party to seek only the "actual pecuniary loss sustained as a direct result of the wrong[.]" *Id.* at 1373. Because Plaintiffs have proffered no evidence that they suffered an actual pecuniary loss from the alleged misrepresentation, they have failed to establish an essential element of their claim. In such circumstances, summary judgment is warranted. *See Catrett*, 477 U.S. at 322 (holding summary judgment is mandated against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case").

For the foregoing reasons, Defendants' motion for summary judgment with respect to Plaintiff's fraudulent inducement claim based on the term of the CB&I Contract is GRANTED.

### 2.     Ownership of Hardware Located at the VA.

Plaintiffs allege that Defendants' inventory of fixed assets set forth on Zovy's 2015 financial statements included hardware owned by the VA. Defendants concede that the hardware provided by Zovy that is located at the VA "could not be recovered by Zovy[.]" (Doc. 81-1 at 21.) Plaintiffs contend that Defendants knew that the VA owned the hardware in question based on correspondence between Mr. Grossman and Thundercat stating that, "[a]ll hardware will be property of the VA and will be supported and maintained by Zovy." (Doc. 88-15 at 1.) Plaintiffs point to two profit and loss financial documents for the terms of January through December 2015 and January through May 2016 which they claim to have relied on to their detriment. (Doc. 81-5 at 112-14.) The statement for January through December 2015 records as income the sale of hardware in the value of $60,000. *Id.* However, the words "hardware" and "VA" do not appear on the statement for January through May 2016, nor does the statement contain any affirmative representation that the VA hardware is owned by Zovy *Id.* Plaintiffs admit that it was not until after the acquisition had been finalized that they received a

"Detailed Depreciation S[c]hedule" of Zovy's hardware assets which included three hardware assets identified as "VA hardware" and whose value was represented to be $167,156. (Doc. 88-14 at 3.)[3] The acquisition date listed for these three assets is September 30, 2016, one week after Plaintiffs acquired Zovy. *Id.*

Plaintiffs have proffered evidence that the detailed hardware asset schedule provided to them by Defendants may have misrepresented the ownership of assets located at the VA. However, they cannot further establish that they reasonably relied on this information because it is undisputed that the statement in question was provided to Plaintiffs post-acquisition. A claim of fraudulent inducement under New York law requires Plaintiffs to proffer evidence of reasonable reliance either prior to entering into an agreement or in the course of performing thereunder. *See Merrill Lynch & Co.*, 500 F.3d at 181. Because Plaintiffs received the document in question only after Capax acquired Zovy, they could not have relied on that document to their detriment.

Similarly, Plaintiffs have not established that the documents provided to them prior to acquisition misrepresented assets owned by the VA as a portion of the fixed assets on Zovy's 2015 financial documents. The profit and loss sheets that Plaintiffs reference do not record hardware located at the VA as an asset of Zovy, rather, they indicate that Zovy had $60,000 in cash assets from the sale of unspecified hardware.

Even if Plaintiffs could establish by clear and convincing evidence that Defendants intentionally made a false representation on which Plaintiffs reasonably relied to their detriment in deciding to acquire Zovy, Plaintiffs have not proffered clear and convincing evidence of out of pocket damages they suffered as a result of the alleged misrepresentation. It is not enough to simply allege that Defendants "inflated the assets of Zovy creating the perception of a company with more tangible assets[.]" (Doc. 88 at 23.) Instead, out of pocket damages are calculated as "the difference between the value of the received consideration and the delivered consideration[.]" *Kumiva Grp., LLC. v. Garda*

---

[3] Defendants point out that when attempting to sell Zovy in 2018, Plaintiffs included this same fixed asset amount in financial documents provided to a potential buyer.

*USA Inc.*, 45 N.Y.S.3d 410, 413 (N.Y. App. Div. 2017). In the absence of such proof, Plaintiffs' fraudulent inducement claim must fail.

Because Plaintiffs have not established the essential elements of their fraudulent inducement claim based upon the ownership of VA hardware, Defendants' motion for summary judgment with respect to that claim is GRANTED.

### 3.    The Value of Zovy's Outstanding Accounts Receivable.

Plaintiffs allege that Defendants included amounts from invoices that were not yet sent to customers in reporting the amount of accounts receivable in their pre-acquisition financial statements and further contend that the invoices in question were created prior to closing but were not sent "as the customers had not issued Zovy, LLC, a signed contract or purchase order." (Doc. 88 at 23.) In support of this claim, Plaintiffs cite a September 26, 2016 email exchange between Mr. Grossman and Defendant Alexson in which Defendant Alexson wrote that Zovy had been "advised not to send [the invoices] to clients yet." (Doc. 88-16 at 1.) Defendants respond that all such invoices constituted "rights to receive payment" as defined in the Agreement because all of the invoices, with one exception, were paid post-closing. (Doc. 81-1 at 23.) Plaintiffs do not dispute that all but one of the invoices were ultimately paid.

While Plaintiffs identify a genuine dispute of fact as to whether there was a misrepresentation regarding whether invoices were sent to clients before the Zovy acquisition, Plaintiffs have failed to show that they incurred any "out of pocket" damages caused by that alleged misrepresentation. *Kumiva Grp., LLC*, 45 N.Y.S.3d at 413. Indeed, they have not shown that Zovy's accounting of accounts receivable caused them any loss at all. Consequently, even if Defendants fraudulently included $147,189.58 in Accounts Receivable in "an attempt to falsely make Zovy appear more attractive[,]" (Doc. 88 at 24) Plaintiffs cannot establish either that they paid a greater amount of consideration than the actual value of Zovy as a result or that post acquisition they suffered a loss. *See Kumiva Grp., LLC*, 45 N.Y.S.3d at 413 (holding that to prove out of pocket damages, "plaintiff must prove that the defendant's fraudulent inducement directly caused the plaintiff to agree to deliver consideration that was greater than the value of the received

consideration"). In the absence of such evidence, Defendants' motion for summary judgment with regard to Plaintiffs' fraudulent inducement claim related to the invoices included in Zovy's Accounts Receivable must be GRANTED.

**4.     Zovy's Liability to HP under the CB&I Contract.**

With regard to the final remaining component of their fraudulent inducement claim, Plaintiffs allege that Defendants failed to disclose costs that were owed to HP in relation to the CB&I Contract with respect to the cost of deletion, data safe archiving, data restoration, data migration, and return services. Plaintiffs claim these costs created a total liability of $1.628 million dollars and proffer evidence that Defendant Reed testified that Mr. Grossman "had represented that there would be no data deletion cost" and that "the deletion wouldn't be something that would have to be paid for[,]" but that they "didn't have anything specific to indicate in writing that there would be no data deletion cost." (Doc. 88-6 at 7-8.) Plaintiffs contend that from February to July 2017, they paid HP over $600,000 for data services.

Defendants respond that pre-acquisition, Plaintiffs were provided with the CB&I Contract which states that the contract price included the cost of "HP costs and expenses required for the Project." (Doc. 81-5 at 46.) Defendants also contend that all invoices received by Zovy related to such costs were included on an Accounts Payable statement provided to Plaintiffs the day before the acquisition. (Doc. 81-4 at 4, ¶ 18.) Defendants proffer evidence that the Accounts Payable Aging Summary dated September 22, 2016 includes an entry titled "Hewlett-Packard" which totals $63,368.67. *Id.* at 98. On July 19, Mr. Grossman emailed financial documents to John Biaocco including profit and loss projections for 2016 which show an increase in the cost of "Software, Data Center Infrastructure" under Cost of Goods sold from $142,533.47 in July to $198,783.47 in August. (Doc. 81-5 at 114.) Defendants contend that the extra $56,500 represents costs payable to HP in relation to the CB&I Contract which would total an estimated $675,000 annual cost. (Doc. 81-1 at 25.)

Plaintiffs counter that Mr. Grossman misrepresented the cost of data deletion services in relation to the CB&I Contract, however, they do not further establish by clear

and convincing evidence that their reliance on that representation was reasonable in light of their receipt of the CB&I Contract itself.

"[W]here . . . there is a meaningful conflict between an express provision in a written contract and a prior alleged oral representation, the conflict negates a claim of reasonable reliance upon the oral representation." *Hong Qin Jiang v. Li Wan Wu*, 118 N.Y.S.3d 208, 213-14 (N.Y. App. Div. 2020) (internal brackets and citation omitted). This principle is buttressed where, as here, the contract in question contains a merger clause. *See Wurstbaugh v. Banc of Am. Sec. LLC*, 2006 WL 1683416, at *7 (S.D.N.Y. June 20, 2006) (finding that a "[m]erger [c]lause reflects the parties' intention to make the Agreement comprehensive, and further undermines as a matter of law the reasonableness of plaintiffs' asserted reliance on oral representations"). Because Plaintiffs received the written CB&I Contract which provided that Zovy would be liable to HP for "costs and expense required for the Project" (Doc. 81-5 at 46) and because Plaintiffs further had evidence of Zovy's ongoing payment of those costs and expense to HP, Plaintiffs' reliance on an alleged oral misrepresentation to the contrary was unreasonable as a matter of law. *See Johnson v. Cestone*, 80 N.Y.S.3d 15, 16 (App. Div. 2018) (holding that Plaintiff failed to state a cause of action for fraud because Plaintiff could not show "she reasonably relied on the alleged misrepresentations").

In addition to failing to establish reasonable reliance, Plaintiffs have not proffered admissible proof of damages. Plaintiffs cite the deposition testimony of Mr. McGrath, Capax's COO, that Capax had paid "[s]omewhere in the 6- to $700,00 range" (Doc. 88-5 at 3) to HP under the CB&I Contract as of March 25, 2019, they do not, however, proffer evidence of the "actual value of the consideration received[,]" or that "defendants' fraudulent inducement directly caused plaintiff to agree to deliver consideration that was greater than the value of the received consideration." *Kumiva Grp., LLC*, 45 N.Y.S.3d at 413. Consequently, even if Zovy's actual value at the time of acquisition was reduced by $600,000 to $700,000 to account for the liability to HP, Plaintiffs have offered no evidence to show that the resulting value of Zovy was less than its purchase price of one dollar plus the earn-out consideration that has not been paid. In the absence of clear and

convincing evidence that Plaintiffs suffered compensable damages, Defendants' motion for summary judgment on Plaintiffs' fraudulent inducement claim must be GRANTED with respect to the HP liability in the CB&I Contract.

For the foregoing reasons, the court GRANTS judgment in Defendants' favor with regard to the entirety of Plaintiffs' fraudulent inducement claim (Count II).

**F.   Whether Defendants are Entitled to Summary Judgment on Their Breach of Contract Counterclaim.**

Defendants seek summary judgment on their breach of contract counterclaim because Plaintiffs have failed to pay any earn-out consideration as contemplated under the EPA. Plaintiffs do not dispute that under the terms of the EPA, Defendants are entitled to earn-out compensation and that Capax has failed to pay any earn-out consideration to Defendants. They contend, however that notwithstanding these contracted obligations their performance is excused because of Defendants' own material breaches of the EPA. They further dispute Defendants' calculation of the earn-out consideration.

**1.   Whether Plaintiffs' Performance is Excused.**

"[P]erformance under a contract is excused" only where the other party "has committed a material breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). This places the burden on Plaintiffs to establish a material breach by Defendants which excuses their own failure to perform. Plaintiffs allege Defendants materially breached § 5.9 of the EPA by failing to disclose a $1.628 million liability to HP in relation to the CB&I Contract. That section contains a certification that "[Zovy] does not have any liabilities or obligations that would reasonably be expected to have a Material Adverse Effect on [Zovy], the [b]usiness, or the assets of [Zovy], except those set forth or adequately reserved against on the balance sheets contained in the Financial Statements[.]" (Doc. 88-4 at 12, § 5.9.)

Plaintiffs assert that Defendants represented to them that there would be no costs associated with the deletion of data, and that other related data services costs owed to HP under the CB&I Contract were never disclosed to them. Plaintiffs point to Defendant

Reed's deposition wherein she stated that Mr. Grossman, Zovy's CEO, "had represented that there would be no data deletion cost, and so the cost of that contract was related to getting data from HP, but that the deletion wouldn't be something that would have to be paid for." (Doc. 88-6 at 7-8.) Plaintiffs further assert that the financial documents provided to them do not adequately disclose the liability because the amounts owed to HP in the Accounts Payable Aging Summary do not match the projected costs reported in the profit and loss financial statements. (Doc. 88 at 15.) Plaintiffs dispute whether they received HP invoices relative to the CB&I Contract totaling $63,368.67, and maintain that because HP was an "active vendor" of Zovy, inclusion of amounts owed to HP on the Accounts Payable Aging Summary was not sufficient to alert Plaintiffs to the HP liability under the CB&I Contract. *Id.*

Defendants respond that they provided Plaintiffs with the CB&I Contract and other financial information prior to the Zovy acquisition, and that the HP liability was disclosed on the Accounts Payable summary and on profit and loss projections that were provided to the Plaintiffs. Defendants point to an affidavit by Defendant Reed[4] in which she affirms that "Zovy did project the HP costs and disclosed them to Capax prior to Acquisition[,]" and "also advised Capax to expect future costs going forward." (Doc. 81-4 at 4, ¶¶ 18, 19.) Defendant Reed also states that "Zovy received HP invoices relative to the CB&I Contract" and that "[a]ll received invoices were included on an Accounts Payable[] statement provided to Capax prior to the Acquisition." *Id.* Defendants proffer

---

[4] Plaintiffs contend that the court should refuse to consider Defendant Reed's affidavit under the "sham issue of fact" doctrine because it is inconsistent with her prior deposition testimony. However, the Second Circuit has "declined to disregard an affidavit as a 'sham' in cases where there is a readily apparent, plausible explanation for the inconsistency." *Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (internal quotation marks omitted). Here, Defendant Reed's deposition testimony refers specifically to Mr. Grossman's representations about deletion costs related to the CB&I Contract but acknowledges that there would be other costs related to "getting data from HP[.]" (Doc. 88-6 at 7-8.) This testimony is not inconsistent with her subsequent affidavit which affirms that "Zovy did project the HP costs and disclosed them to Capax prior to the Acquisition [of Zovy.]" (Doc. 81-4 at 4, ¶ 18.) In addition, Reed's affidavit statements are "corroborated by other independent evidence[.]" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014). Thus, the court is not prohibited from considering the Reed affidavit.

evidence of the disclosures described by Defendant Reed in her affidavit in the form of an Accounts Payable Aging Summary provided the day before acquisition which includes an entry for "Hewlett-Packard" in the amount of $63,368.67. (Doc. 81-4 at 98.) Defendants contend that future costs related to the CB&I Contract were also projected on a financial statement provided to Plaintiffs on July 29, 2016 which shows an increase in "Software, Data Center Infrastructure" costs from $142,533.47 to $198,783.47 (Doc. 81-5 at 56) and that this increase of $56,500 per month represents the total projected $675,000 annual cost of data services owed to HP under the CB&I Contract.

Because there are genuine questions of fact as to whether the liability to HP was "set forth or adequately reserved against on the balance sheets contained in the financial statements" in compliance with § 5.9 of the EPA, summary judgment on the issue of whether Defendants materially breached the EPA cannot be decided at this time. *See Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F. Supp. 3d 329, 349 (S.D.N.Y. 2019) (denying summary judgment on breach of contract claim where non-moving party identified evidence raising genuine questions of fact regarding terms of agreement). Defendants' motion for summary judgment with regard to its breach of contract counterclaim is thus GRANTED in PART on the issue of liability because the court finds as a matter of law that Plaintiffs have failed to perform under the EPA but DENIED as to whether all or part of Plaintiffs' performance is excused due to an alleged material misrepresentation by Defendants.

## 2.    Calculation of the Earn-out.

Defendants assert that Plaintiffs "manipulate[d] the timing of payments to reduce the [earn-out] owed" and ask the court to order an award of earn-out compensation as if those payments were received during the preceding calendar year. (Doc. 81-1 at 15.) Plaintiffs "vehemently disagree with Defendants' earn-out calculation[,]" replying that Capax's COO Mr. McGrath did not have "any control over when Thundercat paid[.]" (Doc. 88-2 at 3-4, ¶¶ 24, 28.) As such, Plaintiffs contend that the earn-out calculation should be made based on Zovy's "actual receipt" of payments from Thundercat, as per the terms of the EPA. (Doc. 88-4 at 6, § 2.4.2.)

Defendants proffer evidence that Mr. McGrath requested that an employee "ensure that [Zovy did] not get paid until 2017" for an invoice that was dated December 2, 2016. (Doc. 81-5 at 9.) They contend that Mr. McGrath also intentionally delayed payment of invoices sent to Thundercat at the end of 2017 by requesting that an employee let him know if "any money is received by Zovy from Thundercat via check" before depositing the money. (Doc. 94-1 at 2.) In addition to citing certain emails that show that Thundercat repeatedly requested the December 2017 invoice and that Mr. McGrath was aware of those requests, Defendants further rely on Mr. McGrath's deposition testimony that a "portion" of the reason why this invoice was not sent until 2018 was "to have the VA earn-out recalculate if the cash came in the next year" (Doc. 81-10 at 6) as undisputed evidence of Plaintiffs' intentional and bad faith breach of the earn-out compensation provision of the EPA.

Plaintiffs dispute whether Mr. McGrath's attempts to delay payment by Thundercat actually caused any delay to occur and point out that the invoice dated December 2, 2016 was ultimately paid by Thundercat on January 13, 2017, forty-two days later. By comparison, three invoices remitted to the VA in 2015 were paid by Thundercat within fifty-five, sixty, and twenty-five days of the invoice dates, respectively. On this basis, Plaintiffs contend that a forty-two-day period between the date of the December 2, 2016 invoice and the receipt of payment was within the ordinary course of dealings between Zovy and Thundercat and indicates the absence of intentional delay or manipulation.

"[A] determination of bad faith or willful or negligent disregard of the rights of the other party . . . is generally a question of fact[.]" *Wallace v. Merrill Lynch Cap. Servs., Inc.*, 814 N.Y.S.2d 566, 2005 WL 3487809, at *5 (N.Y. Sup. Ct. Dec. 14, 2005). Accordingly, although Defendants' evidence of bad faith is compelling, a jury rather than the court must weigh the parties' competing evidence of Plaintiffs' intent.

Because genuine issues of material fact exist as to whether Plaintiffs acted in bad faith by allegedly delaying the timing of payments received by the VA to "have the VA

earn-out recalculate[.]" (Doc. 81-10 at 6.) Defendants' motion for summary judgment seeking a calculation of the earn-out must be DENIED.

> **G.    Whether Defendants Are Entitled to Summary Judgment That Their Liability Is Capped at $300,000 Pursuant to the Terms of the EPA.**

Defendants ask the court to find that the cap in the EPA limits Defendants' liability to $300,000. Plaintiffs respond that the court should not enforce the liability cap because there is evidence that Defendants intentionally breached the EPA by misrepresenting existing obligations under the CB&I Contract.

Provisions limiting liability for breach of contract are enforceable "even against claims of a party's own ordinary negligence." *Morgan Stanley Mortg. Loan Tr. 2006-13ARX v. Morgan Stanley Mortg. Cap. Holdings LLC*, 36 N.Y.S.3d 458, 462 (N.Y. App. Div. 2016). Such provisions "allocate the risk of economic loss in the event that the contemplated transaction is not fully executed[.]" *Id.* (internal brackets omitted) (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 643 N.E.2d 504, 507 (N.Y. 1994)). However, a party "may not insulate itself from damages caused by its grossly negligent conduct" if that conduct "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing[.]" *Id.* (internal quotation marks omitted) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993)).

The EPA provides in relevant part that "the aggregate liability of the Members" for "any inaccuracy or breach of any representation or warranty . . . contained in Articles IV or V" is limited to $300,000. (Doc. 88-4 at 23,25, §§ 8.2.1, 8.9.2.) Thus, Plaintiffs' recovery for any inaccuracy or breach of the representations in Articles IV and V of the EPA is limited to $300,000 absent a showing that Defendants engaged in "intentional wrongdoing." To date, Plaintiffs have not established admissible evidence of Defendants' "intentional wrongdoing." They have also not established that a material misrepresentation would suffice to establish "intentional wrongdoing" under New York law. In the absence of such evidence, Defendants' motion for summary judgment seeking

a determination that their liability under the EPA is limited to $300,000 is
CONDITIONALLY GRANTED.[5]

### H.   Whether Plaintiffs Are Entitled to Summary Judgment on Defendants' Libel Counterclaim.

Plaintiffs seek summary judgment with regard to Defendants' libel counterclaim,
maintaining that Mr. Ragusa's July 24, 2018 Fraud Alert merely "describes the judicial
proceeding" and is thus protected by privilege under New York Civil Rights Law § 74
("NYCRL § 74"). (Doc. 83-3 at 9.) Plaintiffs further assert those statements are protected
by a qualified privilege to communicate to "parties that may have some common interest
in the subject matter[.]" *Id.* at 11. The court rejected Plaintiffs' privilege arguments in the
context of Plaintiffs' motion to dismiss.

To prevail on a libel claim under New York law, a plaintiff must show: "(1) a
written defamatory factual statement concerning the plaintiff; (2) publication to a third
party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se*
actionability." *Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014). Special damages
result from "the loss of something having economic or pecuniary value which must flow
directly from the injury to reputation[,]" while "a writing which tends to disparage a
person in the way of his office, profession, or trade is defamatory per se[.]" *Celle v.
Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (emphasis and internal
quotation marks omitted). Where a defamatory statement relates only to private issues,
"[i]n light of the reduced constitutional value of speech involving no matters of public
concern, . . . state interest adequately supports awards of presumed [per se] . . . damages-
even absent a showing of actual malice." *Dun & Bradstreet, Inc. v. Greenmoss Builders*,

---

[5] Because the court has declined to calculate the earn-out compensation owed to Zovy's
Members, it remains possible, albeit unlikely, that at trial Plaintiffs' proof of Defendants' alleged
material misrepresentation will rise to the level of "a reckless disregard for the rights of others"
or "intentional wrongdoing" and will thereby impact the cap on liability that the EPA otherwise
imposes. *See Morgan Stanley Mortg. Loan Tr. 2006-13ARX v. Morgan Stanley Mortg. Cap.
Holdings LLC*, 36 N.Y.S.3d 458, 462 (N.Y. App. Div. 2016). In contradiction to Plaintiffs'
fraudulent inducement claim, a material breach need only be established by a preponderance of
the evidence. For this reason, Defendants' motion is only conditionally granted.

*Inc.*, 472 U.S. 749, 761 (1985). Whether a statement is defamatory is a question of law for the court to determine based on a "fair reading in the context of the publication as a whole." *Celle*, 209 F.3d at 177 (emphasis omitted).

The Fraud Alert described the proceedings in this case but also included the following additional factual representations:

> Timothy Dibble and Jessica Reed remain personally liable for fraud.

> We are continuing to investigate allegations regarding Timothy Dibble and Jessica Reed, who were named personally for fraud in Capax Discovery's complaint. Although Dibble and Reed attempted to have themselves personally removed from the complaint, the judge denied their request. They remain personally as a defendant with no corporate shield to protect them from their role in this alleged fraud.

> Chances are you may well be a victim of fraud.

(Doc. 83-4.)

NYCRL § 74 provides immunity from suit "for the publication of a fair and true report of any judicial proceeding[.]" The statute "does not afford protection if the specific statements at issue, considered in their context, suggest more serious conduct than that actually suggested in the official proceeding." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (internal quotation marks and brackets omitted). "The privilege defined under [NYCRL § 74] is . . . inapplicable" to the Fraud Alert statements concerning the personal liability of Defendants Dibble and Reed for fraud. Doc. 47 at 8 (noting that those statements "are arguably not 'fair and true reports' as they fail to reflect that th[e] case [was] at the pleading and discovery stage and no such determinations [had] been made"). Because Plaintiffs have not proffered any additional evidence that these statements, "despite . . . inaccuracies, . . . do[] not produce a different effect on a reader than would a report containing the precise truth[,]" NYCRL § 74 is inapplicable. *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017).

Plaintiffs also assert that the Fraud Alert is protected by a "common interest" privilege which "arises when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty." *Yong Ki*

*Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 433 (E.D.N.Y. 2013). The common interest privilege applies "where members of an organization discuss among themselves matters of concern to the organization." *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 174 (E.D.N.Y. 2014) (internal quotation marks and citation omitted). Where statements are made "*solely* with malice[,]" which "includes spite, ill will, knowledge that the statements are false[,] or reckless disregard as to whether they are false[,]" the common interest privilege will not shield those statements from liability. *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 515 (S.D.N.Y. 2017) (emphasis in original) (internal quotation marks and citations omitted). Plaintiffs argue that the Fraud Alert was "sent . . . to a limited number of parties who have previously done business with [Defendants]." (Doc. 83-3 at 10.) They do not identify the companies or individuals in question but instead rely exclusively on Mr. Ragusa's deposition testimony that he sent the message to "less than twelve" recipients.[6] (Doc. 86-3 at 5-6.) Because that testimony is silent on the identity of the Fraud Alert recipients, Plaintiffs have not shown that the communication was made to persons "having a corresponding interest or duty" and thus the common interest privilege does not apply. Having determined that Plaintiffs' claimed privileges do not apply as a matter of law, they court turns to the actionable portion of the Fraud Alert.[7]

Defendants admit that they "are not aware of, to date, a specific lost business opportunity as a result of the Fraud Alert[,]" (Doc. 86-1 at 2, ¶ 5), which forecloses their ability to obtain special damages. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 525 (S.D.N.Y. 2013) (noting that special damages "must be fully and accurately identified, with sufficient particularity to identify actual losses") (citation omitted); *cf. Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) ("Where

---

[6] The exact number of recipients is immaterial, as the publication requirement is satisfied once the defamatory statement is "read by a person other than the author and the one defamed[.]" *Barber v. Daly*, 586 N.Y.S.2d 398, 400 (N.Y. App. Div. 1992).

[7] The Fraud Alert's statement that "[c]hances are you may well be a victim of fraud" constitutes an opinion which, "as opposed to [an] assertion[] of fact, [is] deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." (Doc. 47 at 9) (quoting *Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008)). As a result, that statement does not provide a basis for Defendants' libel counterclaim.

loss of customers constitutes the alleged special damages, the individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized.") (internal quotation marks and citation omitted). Nonetheless, in a case involving "not only a private-figure plaintiff, but also speech of purely private concern[,]" nominal damages for libel per se may be recoverable and do not require a showing of malice. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774 (1986) (citing *Dun & Bradstreet*, 472 U.S. at 751-52).

Here, a jury could reasonably determine that the Fraud Alert's statements about Defendants Dibble and Reed "imput[e] to [them] . . . fraud, dishonesty, [or] misconduct," rendering them per se defamatory and satisfying the injury requirement of Defendants' libel counterclaim even without the presence of special damages. *Lee v. Jarecki*, 2019 WL 948881, at *12 (S.D.N.Y. Feb. 14, 2019) (quoting *Four Star Stage Lighting, Inc. v. Merrick*, 392 N.Y.S.2d 297, 298 (N.Y. App. Div. 1977)). As a result, Plaintiffs' motion for summary judgment on Defendants' libel counterclaim must be DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 81) is GRANTED IN PART and DENIED IN PART and Plaintiffs' motion for partial summary judgment on Defendants' libel counterclaim (Doc. 83) is DENIED.

SO ORDERED.

Dated this 30th day of September, 2020.

Christina Reiss, District Judge
United States District Court