IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
CAPAX DISCOVERY, INC., WALKER :
GLOBAL SOLUTIONS NAPLES, INC., JOHN :
BAIOCCO, WYNN HOLDINGS, LLC, :
THOMSON FEDERAL SOLUTIONS, LLC, :          Civil Action No.  17-CV-00500
ANTHONY J. RAGUSA a/k/a TONY WALKER :
  :
        Plaintiffs/Counterclaim Defendants, :
  :
        -against- :
  :
AEP RSD INVESTORS, LLC, ZOVY :
MANAGEMENT LLC, ZOVY INCENTIVE LLC, :
ALTA EQUITY PARTNERS I MANAGERS, :
LLC, JESSICA REED, TIMOTHY DIBBLE, :
TIMOTHY ALEXSON, GRACE CONNELLY, :
  :
        Defendants/Counterclaim Plaintiffs. :
---------------------------------------------------------------- x

## COUNTERCLAIM PLAINTIFFS'
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's June 10, 2021 Minute Entry, Counterclaim Plaintiffs AEP RSD Investors, LLC, Zovy Management LLC, Zovy Incentive LLC, Jessica Reed and Timothy Dibble, by their undersigned attorneys, hereby submit their Proposed Findings of Fact and Conclusions of Law from the Bench Trial that occurred on April 19, 2021 and June 10, 2021.[1]

## PROPOSED FINDINGS OF FACT

### The Parties

1.    Alta Equity Partners ("Alta") is a small private equity firm broadly focused on investing in lower middle market companies across a variety of industries.  Day 1 at p. 137.

---

[1] References to the April 19, 2021 Trial Transcript are "Day 1 at ____" and the June 10, 2021 Trial Transcript are "Day 2 at ____."

2.      In 2014, Alta, through a newly created entity, AEP RSD Investors, LLC ("AEP") acquired Rand Secure Data[2] a company which provides, among other things, various data governance solutions.  Day 1 at pp. 137-138.

3.      AEP renamed Rand Secure Data as Zovy, LLC.   Day 1 at p. 137.

4.      Timothy Dibble and Jessica Reed were members of AEP, which owned 85 percent of Zovy.   Day 1 at p. 140; Day 2 at pp. 51-52.

5.      Christopher Grossman ("Grossman") was the Chief Executive Officer of Zovy from the time of its inception in 2014 through Capax's acquisition of Zovy on September 23, 2016 until he resigned in October 2018.   Day 1 at pp. 119, 138.

6.      Grossman and other Zovy key management co-invested to obtain a minority ownership in Zovy through the entity Zovy Management LLC ("Zovy Management").    Day 1 at p. 138.

7.      Zovy Incentive, LLC ("Zovy Incentive") also held a minority interest in Zovy to incentivize certain Zovy employees for their "sweat equity" contributions to the company.  Day 1 at pp. 138-139.

8.      AEP, Zovy Incentive and Zovy Management LLC (the "Members") were the members of Zovy at the time of Capax's acquisition on September 23, 2016.    Answer and Counterclaim at ¶ 22; Reply to Counterclaims at ¶ 22.

9.      Anthony Ragusa a/k/a Tony Walker ("Ragusa") owned a majority share in Plaintiff Capax Discovery, Inc.  Day 2 at p. 74.

10.      John Baiocco ("Baiocco") and Thomas Thomson ("Thomson") were minority partners in Capax.   Day 2 at pp. 61-62, 74.

---

[2] Rand is referred to in the trial transcript as Ram.

11.     At all relevant times, Michael McGrath ("McGrath") has been employed by Capax  in various titles such as Chief Operating Officer, Chief Financial Officer and Chief Performance Officer.  Day 1 at p. 14.

**Capax's Acquisition of Zovy**

12.     Grossman reached out to Baiocco to discuss either a potential partnership between Capax and Zovy or Capax's purchase of Zovy.   Defendants' Answer and Affirmative Defenses to Amended Complaint and Counterclaim Plaintiffs' Amended Counterclaims dated October 18, 2018 (Doc. No. 49) (the "Answer and Counterclaim") at ¶ 26; Counterclaim Defendants' Reply to Defendants' Counterclaims as Set forth in Its Answer ("Reply to Counterclaims") dated January 10, 2019 (Doc. No. 64) at ¶ 26.

13.     Capax was interested in working with Zovy because of, among other things, Zovy's highly profitable contract with the United States Veterans Administration (the "VA"). Answer and Counterclaim at ¶ 27; Reply to Counterclaims at ¶ 27.

14.     On September 23, 2016, AEP, Zovy Management and Zovy Incentive entered into an Equity Purchase Agreement (the "Agreement") with Capax whereby Capax acquired Zovy on the date of said Agreement.   Trial Exhibit 1.

15.     Pursuant to Sections 2.3 and 2.41 of the Agreement, Capax acquired Zovy for one dollar plus the payment of earnout Consideration calculated as fifty percent of the annual gross "VA Revenue" as defined in the Agreement received by Capax or any Affiliates that is in excess of $1 million (for calendar years 2016 and 2017) and $1.5 million for (calendar years 2018, 2019, and 2020).  Trial Exhibit 1 at p. 6.

16.     Pursuant to Section 2.4.2.1 of the Agreement, Capax agreed to operate the Zovy business "in good faith" throughout the five-year earnout period.  Trial Exhibit 1 at p. 6.

17.     Pursuant to Section 8.3 of the Agreement, Capax agreed to indemnify and hold harmless the Members and their principles and directors from, among other things, "any and all Losses resulting from or arising out of or in connection with or relating to any of the following .. . 8.3.2. any breach of any agreement, covenant or obligation of the Purchaser contained herein . . ." Trial Exhibit 1 at p. 23.    Losses are defined to include "reasonable attorney's fees and expenses." *Id.* (see Section 8.2).

18.     Pursuant to Section 8.9.2 of the Agreement, the aggregate liability of AEP, Zovy Incentive and Zovy Management "shall not exceed $300,000." Trial Exhibit 1 at p. 25.[3]

**The Members Are Entitled to Earnout Consideration**

19.     At all relevant times, Thundercat Technologies, LLC ("Thundercat") contracted with the VA to administer the VA's contract with Zovy. Day 1 at p. 37.

20.     Post-acquisition of Zovy, Capax received VA Revenue as defined in the Agreement on the following dates:

| Date | Amount of VA Revenue |
| --- | --- |
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| March 23, 2018 | $325,000 |

Trial Exhibit 3; Day 1 at pp. 21, 32 (McGrath acknowledging the accuracy of the amounts set forth in Trial Exhibit 3 both at trial and at his deposition[4] and the Court admitting the spreadsheet

---

[3] There is an exception for a breach of a Fundamental Representation (defined as Sections 4, 5.1, 5.2, 5.3 and 5.11) but Capax does not even allege a breach of those provisions.

[4] McGrath was Capax's Rule 30(b)(6) Deponent for various topics including the amount of the earnout calculation and the payments received from the VA/Thundercat. Day 1 at 22.

as an adopted admission).

21.     Capax has never paid any earnout consideration to the Members.  Day 1 at p. 140.

22.     Per Section 2.4.2 of the Agreement, the Members were first entitled to earnout compensation on December 3, 2016.   Trial Exhibit 1 at p. 6.; Trial Exhibit 6.

**McGrath Intentionally Delays Zovy's Receipt of the January 13, 2017 and January 12, 2018 Payments of $770,000 to "Mess with Alta" By Resetting the Earnout Calculation**

23.     On November 21, 2016, McGrath sent Baiocco and Grossman an e-mail advising them that $177,396 of earnout Consideration was owed to the Members.  Trial Exhibit 6.

24.     Nine days later, on November 30, 2016, McGrath informed Baiocco that he intended to make sure that Thundercat did not pay a $770,000 invoice until 1/1/2017 to "start the clock on the earnout again" because Capax wanted to "mess with Alta."    Trial Exhibit 7.

25.     Nothing had changed in Capax's dealings with Alta in these nine days.   Day 1 at p. 38.

26.     McGrath *admitted at trial* that, in fact, $770,000 payments due in late 2016 and late 2017 were delayed to restart the earnout for the next calendar year.   Day 1 at pp. 38 and 47, 49-50 (noting it was his "desire" to have the VA earnout recalculate so that the cash would come in the following year), 55.

27.     On December 12, 2016, McGrath asked Zovy's Alexandra MacMurchie to "ensure that we do not get paid until 2017" relative to the $770,000 invoice (1098) that was dated December 2, 2016 and was "ready to send."  Trial Exhibit 8.

28.     Thundercat did not pay this invoice until January 13, 2017.   Trial Exhibit 3.

29.     McGrath instructed an accountant to not deposit any monies received from Thundercat until they speak.  Trial Exhibit 29.

30.    McGrath delayed sending out of a second $770,000 invoice until early 2018 merely because a purchase order number needed to be changed, a correction that McGrath acknowledged does not take long to change.    Trial Exhibits 10-13 (e-mails noting that Thundercat was anxious for the invoice and Capax employees were avoiding phone calls from Thundercat); Day 1 at p. 49.

31.    Ragusa admitted at his deposition that he would "stipulate" and "agree" to pay the earnout calculation assuming McGrath did not delay the January 13, 2017 and January 12, 2018 payments (i.e., they were paid the previous year).   Day 2 at pp 83.   (after being asked whether he agreed with McGrath's actions, Ragusa stated "as I said we're willing to pay the VA earnout at whatever calculation Alta agrees to based on the poor wording of the agreement.").

32.    Baiocco admitted at his deposition that he and his members would pay the earnout based on Alta's calculation.    Day 2 at pp. 70-72.

33.    As such, assuming the two $770,000 payments were not delayed, the Members are entitled to the following Earnout Consideration

**2016 VA Revenue**
| | |
|---|---|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| Total | $2,214,792 |

**50% Earnout over $1 million cap**    **$562,396**

**2017 VA Revenue**
| | |
|---|---|
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| Total | $1,885,992 |

**50% Earnout over $1 million cap**    **$442,996**

<u>2018 VA Revenue</u>

March 23, 2018                               $325,000
**50% Earnout over $1.5 million cap $0**

<u>**Total Earnout**</u>                         **$1,005,392**

Trial Exhibit 5 (McGrath making this calculation at his deposition)[5]

## **Capax Admits That it Did Not Perform Due Diligence Relative to the Zovy Acquisition**

34.    Days after the acquisition, Ragusa prepared an agenda for an upcoming Capax

2016 Fall Conference to be attended by the other partners, McGrath and others.  Trial Exhibit 14.

35.    As to the first topic of discussion, "The Zovy Acquisition" – Ragusa, in part,

wrote as follows:

> Although we think we know what we are getting, this is still a shot in the dark, The
> reason we accelerated the closing process without due diligence is because of the
> immediate cash flow benefit we expect to receive over the next 60 days, especially from
> the VA.

*Id.* at p. 1.

36.    Capax received a $1,000,000 payment from the VA on October 28, 2016.  Trial

Exhibit 3.

## **Despite the Lack of Due Diligence, Zovy Had Strong Financial Performance Post Acquisition**

37.    From the date of acquisition (September 23, 2016) to end of 2016, Zovy had a

gross profit of $1,226,605 and net income of $973,451.   Trial Exhibits 28 and 29 at ¶¶ 31-33,

34-35 (admissions by Capax on summary judgment).

38.    In 2017, Zovy had a gross profit of $3,202,330 and net income of $1,473,545.  *Id.*

39.    In 2017, Zovy distributed $2,446,996 to its members.  *Id.*

---

[5] Note a mathematical mistake was made when McGrath made this calculation at his deposition.  See Day
1 at pp. 29-30.

40.     Zovy's 2017 Partnership Tax Return reflected gross receipts of over $5.6 million and ordinary business income of $1,763,732.   *Id.*

41.     Zovy was profitable in 2018.   *Id.*

**Capax Values Zovy at $60 Million At The Same Time It Commences This Action Seeking to Rescind the Agreement**

42.     On May 5, 2017, Ragusa valued Zovy at a range of $27 million to $60 million. Trial Exhibit 15.

43.     Six days later, Plaintiffs filed a Verified Complaint (verified by Thomson) wherein, as to the First Count of the Complaint, they demand an equitable rescission of the Agreement.   Trial Exhibit 16.

44.     On February 2, 2018 Plaintiffs filed an Amended Verified Complaint (verified again by Thomson) wherein Plaintiffs again demanded an equitable rescission.  Trial Exhibit 17.

45.     Plaintiffs never wanted a rescission and its inclusion was "a mistake" and an "oversight."   Day 1 at pp. 123-125; Day 2 at p. 90.

**The Fraud Alert**

46.     In July 2018, Ragusa drafted and sent out a "Fraud Alert" regarding this litigation. Trial Exhibits 22 and 23 (collectively the "Fraud Alert"); Day 2 at p. 107.

47.     Ragusa sent the Fraud Alert through his LinkedIn account to 10-12 business listed on Alta's website that are listed as companies that do business with Alta.  Day 2 at pp. 107-108.

48.     The Fraud Alert informed recipients that "**Timothy Dibble and Jessica Reed remain personally liable for fraud**."   Trial Exhibit 22 (emphasis in original).

49.     The Fraud Alert informed recipients that "Chances are you may well be a victim of fraud"  Trial Exhibit 22 (emphasis in original).

50.     At the time Ragusa sent the Fraud Alert, Capax was attempting to sell an entity known as Unified Global Archiving, LLC, which would hold assets held by Capax relative to data archiving solutions and services, including Zovy. Day 1 at p. 126  (Thomson acknowledging that in the summer of 2018, a profile of UGA was created and it was heavily marketed); Day 2 at p. 109.

51.     On October 24, 2018, Astra Capital Management LLC submitted a Letter of Intent to Acquire "Unified Global Archive LLC, including Zovy, LLC" for $38 million.   Trial Exhibits 28 and 29 at ¶ 41 (admissions by Capax on summary judgment).

52.     Four of the businesses that received the Fraud Alert (Reach Analytics, Greenwood, Structural Graphics and 1105) reached out to Alta, informed them of the communication and raised concerns about its contents.   Day 2 at pp. 57-58.

53.     Alta, never knowing who the universe of recipients of the Fraud Alert were, reached out to these four companies and other key contacts to dissuade them of the notion that they engage in fraud.   Day 1 at p. 149-150; Day 2 at p. 57-58.

54.     Alta sent Ragusa a cease and desist letter demanding, among other things, a retraction of the Fraud Alert.   Trial Exhibit 24.

55.     Ragusa took no action in response to the cease and desist letter.   Day 2 at p. 109.

56.     After the Court dismissed the fraud claim against all defendants in its decision on the parties' summary judgment motions, Ragusa did not send any communication to the Fraud Alert recipients alerting them that Reed and Dibble were not "personally liable for fraud."   Day 2 at p. 110.

57.     No one ever reached out to Ragusa in response to the Fraud Alert.  Day 2 at p. 110.

**The HP Costs Owed By Zovy Relative to the CB&I Contract**

58. Prior to the Acquisition, Capax received a copy of a contract Zovy had with Chicago Bridge & Iron ("CB&I") with a total price of $1,375,000 (the "CB&I Contract"). Trial Exhibit 20 (email from Grossman to Baiocco dated August 2, 2016).

59. The CB&I Contract references certain associated HP costs that would not be the responsibility of CB&I to pay. Trial Exhibit 19 (attachment thereto at p. 1). Specifically, the CB&I Contract states:

- The Total Price represents the full cost of the Project, meaning that it is a fixed, lump sum price regardless of extended project timelines or difficulties with HP of its software, and includes all Hardware, Software, Services, Travel, **HP costs** and expenses required for the Project.

- Zovy shall, based upon Zovy's existing, separate agreement with HP, ensure that CB&I shall no longer contractually or otherwise obligated to pay to HP any fees . . . ."

*Id.* (emphasis added).

60. Zovy estimated that there would $675,000 in HP costs relative to the CB&I contract. Day 1 at p. 154.

61. On July 29, 2016 and August 3, 2016, Grossman e-mailed Baiocco financial statements containing monthly projected profit and loss statements for the periods of June 2016 through December 2016 in which the HP costs for the CB&I Contract were disclosed. Trial Exhibits 20 and 21; Day 1 at pp 154-159.

62. "Software, Data Center Infrastructure" costs increased from $142,533.47 in July 2016 to $198,783.47 in August 2016, an increase of $56,500, representing HP costs related to the CB&I contract. $56,500 a month represents the $675,000 annual cost expected. Zovy projected these costs to start in August 2016. Trial Exhibits 20 and 21; Day 1 at pp 154-159.

63. Prior to the Acquisition, Zovy received HP invoices relative to CB&I Contract.

64.     All received invoices were included as part of an Accounts Payable statement provided to Capax prior to Acquisition referencing "Hewett-Packard - $63,368.67."    Day 1 at pp. 160-161; Trial Exhibit 18 (last page A/P Aging Summary).

65.     Capax never discussed the CB&I Contract or either of these disclosures with Zovy or Alta prior to the Acquisition.    Day 1 at pp. 153, 159 and 161.

## PROPOSED CONCLUSIONS OF LAW

As a result of this Court's Opinion and Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for Partial Summary Judgment filed September 30, 2020 (Document No. 97) (the "Summary Judgment Decision"), the only remaining claims are (i): the Members' Breach of Contract Counterclaim for Their Earnout Under the Contract and (ii) Reed and Dibble's Libel Counterclaim against Ragusa. Each of these will be addressed in turn:

### A.     The Members' Earnout Claim

66.     The Court already found liability on the Members' earnout claim for Capax's failure to pay the earnout.   Summary Judgment Decision at p. 28.   Thus, the only issues left for this Court to decide relative to the Members' Earnout Claim are:   (i) the calculation of the earnout owed, (ii) whether Capax is entitled to be excused from performance relative to an alleged issue regarding the disclosure of costs due to Hewlett Packard resulting from the CB&I Contract (the "HP Liability") and (iii) if earnout is awarded, the amount of prejudgment interest and attorneys' fees that should be awarded.

### i.     The Amount of the Earnout

67.     It is undisputed that Zovy received VA Revenue as defined in the Agreement on the following dates as depicted on a Thundercat spreadsheet admitted into evidence as Trial Exhibit 3:

| Date | Amount of VA Revenue |
|------|---------------------|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| March 23, 2018 | $325,000 |

Trial Exhibit 3.  Mr. McGrath acknowledged these amounts received both at his deposition as Capax's Rule 30(b)(6) witness on the topic of the earnout and at trial.

68.     The Members argue that, in performing the calculation of the earnout owed, the Court treat the two $770,000 payments received in early 2017 and 2018 as being received in the prior calendar year.   The Members contend that Capax intentionally took actions to delay receipt of these payments to reduce the earnout owed and such conduct is contrary to both the express terms of the Agreement and the implied covenant of good faith and fair dealing inherent in all New York contracts. *P&G Auditors and Consultants, LLC v. Mega International Commercial Bank Co., Ltd.*, 2019 WL 4805862 (S.D.N.Y. Sept. 30, 2019) (*citing 511 W. 232 Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, (2002)).

69.     The Court finds the Members' arguments to have merit.  McGrath admitted at trial that he delayed receipt of these two payments to reduce the amount of earnout owed.  Additionally, the documents introduced at topic unequivocally establish McGrath's actions and his intent to "mess with Alta" by instructing an employee to call Thundercat to delay paying the

2016 $770,000 invoice, asking another employee not to deposit checks received from Thundercat and waiting weeks to send out the 2017 $770,000 invoice merely because the purchase order number needed to be corrected.

70.     There can be no credible doubt of Capax's intent to "mess with [the Members]" and reduce the earnout. The delay reduced the earnout owed because, at the time the $770,000 was due, the $1 million threshold had already been met before the Members were entitled to 50% of subsequent payments received and therefore the $770,000 could be applied to next year's threshold.   See Trial Exhibits 4 and 5 (the calculations of the earnout as actually collected versus treating the two $770,000 payments as received in the earlier calendar year).

71.     Capax's conduct is in express breach of Section 2.4.2.1 of the Agreement which required Capax to operate the Zovy business "in good faith" throughout the five-year earnout period.   Notwithstanding, it also violates the implied covenant of good faith and fair dealing in the Agreement.   While the Agreement calls for the earnout to be calculated using the dates VA Revenue is "actually received," the Members undoubtedly had the right to expect that they would obtain their earnout based on VA Revenue received in *the ordinary course of dealings* between Zovy and Thundercat (and not based on Capax's manipulations).

72.     Capax's only argument on the earnout is that Thundercat typically paid within 45 days of an invoice and therefore Thundercat may have paid in the subsequent calendar year even if the invoice was timely sent.   *See* Day 1 at p. 59.   Capax submitted no documents supporting this claim.   And indeed, such contention is belied by the Thundercat spreadsheet.   By simply comparing the "Document Date" on the invoice and payment, Thundercat, at worst, paid only one invoice more than thirty days from receipt.   Indeed, five of the seven invoices were paid

within 10-21 days.[6]   Of course, if Capax supposedly knew Thundercat  was a late payer, there

would have been no need to go through such lengths to "mess with Alta."  It is also worth noting

that there was testimony from both Ragusa and Baiocco that they were amenable for this Court

to calculate the earnout based on the Members' proposed calculation.

73.    For these members, this Court calculates the earnout as follows:

**2016 VA Revenue**
| | |
|---|---|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| Total | $2,214,792 |

**50% Earnout over $1 million cap**    **$562,396**

**2017 VA Revenue**
| | |
|---|---|
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| Total | $1,885,992 |

**50% Earnout over $1 million cap**    **$442,996**

2018 VA Revenue

| | |
|---|---|
| March 23, 2018 | $325,000 |

**50% Earnout over $1.5 million cap** **$0**

**Total Earnout**                      **$1,005,392[7]**


**ii.    Capax is Not Entitled to Any Reduction of the Earnout**

74.    In its Summary Judgment Order, the Court permitted Capax to introduce evidence

at trial as to whether its failure to pay the aforementioned earnout should be excused based on its

---

[6] The Court excludes the two $770,000 payments in this analysis since the invoice dates are not the actual dates Thundercat received the invoices due to Capax's machinations.

[7] While it is simple math, the Court notes that Capax offered no contrary calculation of the earnout and this calculation is consistent with the calculation McGrath performed at his deposition but for one mathematical error.  Trial Exhibit 5; Day 1 at pp. 29-30.

allegation that the Members failure to disclose the HP Liability.   Summary Judgment Order at pp. 26-28.

75.     Reed credibly testified how she learned from Grossman that he estimated $675,000 in HP costs relative to the CB&I Contract (which references the HP costs and Capax possessed prior to the Acquisition) and how it was disclosed to Capax before the Acquisition. Reed explained and showed this Court at trial how this estimated cost was both included as a projected increased cost and invoices received to date were included on Accounts Payable.  It was also undisputed that Capax received these disclosures and never questioned any of them prior to the Acquisition.  Indeed, in an internal e-mail Ragusa sent to his partners and others days after the Acquisition, he acknowledged that Capax did "no due diligence" because it wanted to receive a pending $1 million payment from Thundercat (which it ultimately did receive). Trial Exhibit 14.  Of course, any lack of due diligence performed by Capax is not the fault of the Members.

76.     Contrary to Reed's credible testimony and for reasons that escape this Court, Capax *did not introduce a single document nor even testimony* that remotely established that such a liability was incurred by Zovy post Acquisition.  It submitted no documents such as contracts that supposedly created this obligation, evidence that the Members possessed such contracts before Capax acquired Zovy or checks that established payments made to HP.   Indeed, *no Capax witness ever testified as to the amount of the liability*.  Ragusa claimed the liability was $1,628,000 but acknowledged it was subsequently settled with HP for less (and possibly less that the $675,000 estimated by Grossman and disclosed by Reed).  Day 2 at p. 121.  While Ragusa claimed "we have the evidence" (Day 2 at p. 117), he never presented it to this Court. Thus, Capax failed to even remotely establish its burden even despite several inquiries by this

Court during trial as to when this evidence would be presented.     *See e.g.*, Day 2 at p. 123-124

(Court asking Ragusa "where are we going to see" the proof that the HP liability was paid).

77.     Finally, Capax's two efforts to challenge Reed's testimony were unavailing.

First, it focuses on Grossman's cover e-mail to Reed's spreadsheet disclosing the costs which

stated that no "data center upgrades" were currently needed.  Capax presumably argues that the

HP costs were "data center upgrades" and therefore, given Grossman's statement, the projected

costs in Reed's spreadsheet could not have been related to the HP Liability.

78.     But both Reed and, ***more importantly Capax's McGrath*** testified that the HP

costs ***were not*** data center upgrades.  *See* Day 1 at p. 155 (McGrath acknowledging the HP costs

were not a data center upgrade).  And again, Capax submitted no evidence countering their own

witness' testimony establishing that the HP Liability was data center upgrades.

79.     Second, Capax focused on Reed's efforts to reach out to Grossman when the

parties were trying to reconcile the book value calculation.   Reed noted that she asked Grossman

for information on the amount of the liability and told him this could cost $300,000 on the

earnout[8] because Capax was claiming the expense was significantly more than the estimated

$675,000.   This is not evidence of any wrongdoing but simply indicative of Reed wanting to

provide further information to resolve the issue so the Members can obtain the earnout they were

entitled to receive.   And again, Capax never even established that Zovy incurred a liability that

exceeded the estimated $675,000 that Reed disclosed.

80.     In summary, the Court finds that the Members disclosed the HP Liability and

Capax submitted no evidence that Zovy or it paid any amount of the HP Liability let alone an

amount more than as estimated by the Members.   Nor did Capax even attempt to submit

---

[8] The Agreement had a cap of $300,000 relative to any misrepresentations.  See Agreement at p. 25.

evidence that any of the Members knew or should have known that the HP Liability would exceed the estimated amount.

81.     As this Court has found the Members are entitled to the earnout, the Court next turns to the Members' claims for prejudgment interest and attorneys' fees.

### iii.     Prejudgment Interest

82.     The Contract is governed by New York law.   As such, the Members are entitled to 9% prejudgment interest.  *See* CPLR § 5004; *see also* CPLR § 5001 (noting that interest shall be calculated from the "earliest ascertainable date" but where damages were incurred at various times, interest shall be computed from the date each item was incurred or a "single reasonable intermediate date.").

83.     Earnout payments were due, at the latest, within fifteen days of the close of the calendar year. *See* Agreement at § 2.4.2.  Therefore, this Court will use start dates of January 15, 2017 date for the 2016 earnout owed and January 15, 2018 for the 2017 earnout owed.[9]

**2016 VA Revenue**

| | |
|---|---|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| Total | $2,214,792 |

**50% Earnout over $1 million cap   $562,396**

Time period for prejudgment Interest (January 15, 2017 through September 7, 2021 = 1696 days or 4.64 years)

Prejudgment interest = $562,396 *.09 *4.55 = **$235,189**
Per diem interest = $138.67

**2017 VA Revenue**

| | |
|---|---|
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |

---

[9] For purposes of these calculations, the Members use a September 7, 2021 judgment date.

Total                                    $1,885,992

**50% Earnout over $1 million cap   $442,996**

Time period for prejudgment Interest (January 15, 2018 through September 7, 2021 = 1300 days or 3.64 years)

Prejudgment interest = $442,996 *.09 *3.56 = **$145,380**
Per diem interest = $ 109.23

**Total Earnout                          $1,005,392**
**Total Prejudgment Interest        $   380,569**

iv.     **Attorneys' Fees**

84.     Pursuant to Section 8.3.2 of the Contract, Capax agreed to indemnity and hold harmless the Members and their principals, directors, officers and others from their reasonable attorneys' fees and expenses relative to its failure to pay to the earnout.

85.     The Members requested, and the Court was amenable to having the submission of attorneys' fees addressed through the filing of a Federal Rule of Civil Procedure 54(d)(2) motion in the event the Court determined that earnout was owed.

86.     As the Court is awarding the Members earnout under the Agreement, the Court hereby further orders that the Members may seek attorneys' fees under Section 8.3.2 through the filing of a Federal Rule of Civil Procedure 45(d)(2) motion within twenty-one (21) days of the entry of this judgment.

B.      **Reed and Dibble's Libel Counterclaim**

87.     This Court has previously opined on the Libel Counterclaim asserted by Reed and Dibble.  When the Court granted Reed and Dibble's motion to amend their counterclaims, it rejected Capax's argument that the Section 74 of the New York Civil Rights privileged applied:

> The Fraud Alert contains the statements "Timothy Dibble and Jessica Reed remain personally liable for fraud" and "[t]hey remain personally as a defendant with no corporate shield to protect them from their role in this alleged fraud."

18

(Doc. 40.).  These statements are arguably not "fair and true reports" as they fail to reflect that this case is at the pleading and discovery stage ***and no such determinations have been made.***

Doc. No. 47 at p. 8 (emphasis added).

Ragusa moved for summary judgment on the libel claim.  The Court denied Ragusa's motion.  Summary Judgment Order at pp. 31-34.  In doing so, this Court (i) restated that the Section 74 privilege was inapplicable after Ragusa raised it a second time; (ii) rejected Ragusa's contention that a "common interest" privilege applied; and (iii) found that the Court can award nominal damages even if Reed and Dibble cannot identify a specific business opportunity lost.

Under this backdrop, the Court finds that the Fraud Alert constitutes libel.  "To prevail on a claim of libel under New York law, a plaintiff must show '(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statements and (5) special damages or *per se* actionability.'"   Summary Judgment Order at p. 31 (*citing Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2000).  *Per se* defamation occurs when the "writing tends to disparage a person in the way of his office, profession or trade."  *Id.* (citing *Celle Filipino Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (emphasis and internal quotation marks omitted).   "Where a defamatory statement relates only to private issues, "[i]n light of the reduced constitutional value of speech involving no matters of public concern . . . state interest adequately supports awards of presumed [per se] . . . damages even absent a showing of actual malice." *Id.* (*citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985).

Ragusa admitted at trial that he sent the Fraud Alert to Alta's business contacts, that he refused to comply with a cease and desist demand and did not send a follow-up communication after this Court dismissed the fraud claim against Reed and Dibble.   Reed and Dibble gave compelling testimony as to how the Fraud Alert impacted their business and the steps they took

in an effort to mitigate any damage.   The Court finds that the statements "Timothy Dibble and Jessica Reed remain personally liable for fraud" and "[t]hey remain personally as a defendant with no corporate shield to protect them from their role in this alleged fraud" were false at the time they were made.   Of course, the Court's decision denying Reed and Dibble's motion to dismiss the fraudulent misrepresentation claim against them merely left open the possibility that they could later be found to have made a fraudulent misrepresentation and did not make them "personally liable for fraud."   As such, this Court awards nominal damages in the amount of one-hundred dollars.

Reed and Dibble also ask this Court to award punitive damages.  Punitive damages are available under New York law in defamation cases "to punish a person for outrageous conduct which is malicious, wanton, reckless, in willful disregard for another's rights."  *DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) (*citing Prozeralik v. Capital Cities Communications, Inc.*, 92 N.Y.2d 466, 479-80 (1993).  Punitive damages may be asserted in a defamation action and constitutional free speech protections are not a bar, upon a finding of actual malice.  *Rombom v. Weberman*, 2002 WL 1461890 (Sup.Ct. Kings. June 13, 2002).   Courts can award substantial punitive damages even upon a finding of nominal compensatory damages.  *See Reynolds v. Pegler*, 123 F.Supp. 36 (S.D.N.Y. 1954) (denying motion to set aside jury verdict of $175,000 in punitive damages even though jury found only one dollar in compensatory damages as against each of the three defendants).

This Court believes punitive damages are warranted against Ragusa.[10]    The intent of Ragusa conduct is clear.  It had nothing to do with warning others of Reed and Dibble or engaging in "common interest" to expose fraud.   As principal of Capax, Ragusa actual intent

---

[10] Reed and Dibble leave it to the Court's discretion as to the amount of punitive damages awarded and do not propose an amount herein.

was simply to avoid paying the earnout.   This is evidenced by:

- The filing of this lawsuit with a claim of equitable rescission and alleged $10 million in damages despite, just six days before filing, Ragusa believing that Zovy was worth $27-$60 million.    The Court rejects the notion that this was a "mistake" and that Ragusa told its first (of five) lawyers to withdraw the claim. No withdrawal was ever filed.   Capax only abandoned the claim after the Members moved for summary judgment at the conclusion of years of discovery.

- The timing of the Fraud Alert (July 2018) coincides with efforts to market and sell the Zovy assets.  The earnout owed potentially through 2020 could have been an impediment to such a sale.

- Ragusa's refusal to take any action in response to a cease and desist nor this Court's dismissal of the fraud claims against Reed and Dibble.  If Ragusa were truly concerned about the other businesses, he would have advised them of the Court's Summary Judgment Order.

Dated: July 19, 2021                      Respectfully Submitted,

By/s/Brian J. Wheelin
Brian J. Wheelin, Esq.
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue – 20th Floor
New York, NY 10017
Tel. No.:  (212) 451-2900
Fax No.:  (212) 451-2999
E-mail:  jclasen@rc.com
              bwheelin@rc.com
              slautier@rc.com

*Attorneys for Defendants/Counterclaim Plaintiffs AEP RSD Investors, LLC, Zovy Management LLC, Zovy Incentive LLC, Alta Equity Partners I Managers, LLC, Jessica Reed, Timothy Dibble, Timothy Alexson, and Grace Connelly*

CERTIFICATION OF SERVICE

I hereby certify that on this 19th  day of July, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

*Brian J. Wheelin*
Brian J. Wheelin