UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

_____

CAPAX DISCOVERY, INC.,

WALKER GLOBAL SOLUTIONS NAPLES, INC.,

JOHN BAIOCCO,

WYNN HOLDINGS, LLC and

THOMSON FEDERAL SOLUTIONS, LLC

      Plaintiffs,


-against-              Civ. No.: 17-cv-00500


AEP RSD INVESTORS, LLC

ZOVY MANAGEMENT LLC,

ZOVY INCENTIVE LLC

ALTA EQUITY PARTNERS I MANAGERS, LLC

JESSICA REED,

TIMOTHY DIBBLE,

TIMOTHY ALEXSON, and

GRACE CONNELLY,


      Defendants/Counterclaim Plaintiffs,


-against-


CAPAX DISCOVERY, INC., and

ANTHONY J. RAGUSA a/k/a TONY WALKER,


      Counterclaim Defendants

Plaintiffs Capax Discovery, Inc., Walker Global Solutions Naples, Inc., John Baiocco, Wynn Holdings, LLC, and Thomson Federal Solutions, LLC, submit the following Summation, Findings of Fact, and Conclusions of Law.

## PLAINTIFFS' SUMMATION

### A. Background

This civil action has been a long and troubling pursuit by my clients made necessary not only by the negligence of the Defendants but more so by the Defendants' unwillingness to reasonably negotiate a settlement for their substantial misrepresentations and omissions.

This action's claims originate from misrepresentations and omissions by Defendants that gave rise to and were incorporated into the representation and warranties of the parties' Equity Purchase Agreement.

On September 23, 2016, Capax Discovery, Inc. purchased Zovy, LLC (Exhibit 1), in good faith, from the Zovy ownership group.  Unfortunately, the business Capax believed they were buying - as presented to them for acquisition - was not the business they received.

**Timothy Dibble, Jessica Reed, and Chris Grossman [among others] negligently omitted significant obligations (Exhibits MM, NN,PP) and falsely included substantial assets that they clearly and knowingly did not own (Besaw Expert Witness Report).**

Additionally, as further evidence of their desire to inflate the value of Zovy, they deceptively characterized the Zovy business as a recurring revenue subscription-fee business (Exhibits P, Q, R), when, in fact, it was a known by the Zovy ownership, especially Chris Grossman, to be a considerably less valuable combination of one-time professional service and recurring subscription-fee business (Exhibits P, Q, R, and Grossman Deposition 2, page 372, line 12 to page 376, line 6 );

Through this civil action, Capax Discovery has presented full substantiation to prove beyond a doubt that the Zovy ownership - and Timothy Dibble, Jessica Reed, and Chris Grossman in particular - all negligently misled my clients prior to and after the closing of the EPA.

**B.  The Zovy Ownership's Desire to Sell**

We have established that the Zovy ownership was agreeable to sell the business that they had recently purchased for $1.5M.  At the time of the negotiations to sell Zovy to Capax, Zovy was in need of additional funding [Exhibit C].  The $1.6M that Zovy had received in good faith from customers for prepaid services had been dissipated [Exhibits C and Exhibit 1, page 33], and there was no additional funding available [Exhibit C] to pay for the costly prepaid services which they were still contractually obligated to deliver.  Although the Zovy ownership attempted to secure additional funding, none was forthcoming, and there was no new additional business [hence the decision to consider replacing Mr. Grossman as CEO], and the liabilities were growing.

Additionally, Capax's purchase of the HPCA software put Zovy in obvious peril of eventually losing its core HPCA software license [Exhibit C] which all of its archiving offerings were built on.

In spite of Zovy ownership's contention that Zovy was a profitable and viable business, the Zovy ownership recognized their predicament [Exhibit C] and was agreeable to sell Zovy for $1 along with the full assumption of their liabilities [Exhibit 1, page 33] and obligations with an undisputed potential earnout if the revenue from the US Department of Veterans Affairs ("VA") via Thundercat Technology LLC ("Thundercat") contracts exceeded specified annual thresholds ($1M and $1.5M).

**C.   Zovy's Misrepresentations: Breach of EPA**

The credible trial testimony and other evidence demonstrate that Defendants in general - and Jessica Reed and Chris Grossman in particular – knowingly participated in a variety of negligent misrepresentations and omissions concerning the assets, liabilities, obligations, revenue model, and material contracts of Zovy.  These costly and damaging misrepresentations and omissions were established by a preponderance of the evidence relating to Zovy's customer engagements, obligations, and contracts with Chicago Bridge & Iron ("CB&I"), Hewlett Packard ["HP"], and the VA via Thundercat Technology LLC ("Thundercat") constituting a material breach of the EPA.

**1.   The First Misrepresentation: The Zovy Liabilities & Obligations**

Zovy entered into a substantial contract with CB&I on May 9, 2016  (the "CB&I Contract").  The value of this CB&I contract was an important component of Zovy's appeal to Capax.  This contract added significant short-term and long-term value to Zovy.  April 19, 2021, Tr. at p. 94, ln. 25.

In addition to the disclosed obligations of the CB&I contract of May 9, 2016, Zovy had additional and substantial undisclosed obligations to pay HP [on behalf of CB&I] for data deletion and other deliverables which amounted to $1,628,000.

**It is important to note that these obligations to pay HP [on behalf of CB&I] arose from a negligently undisclosed separate contract between HP and CB&I.** (Exhibits LL, MM, NN)

Capax has proved beyond a doubt that the Zovy ownership was fully aware that Zovy had these unavoidable and costly obligations to pay HP [on behalf of CB&I].  The Zovy ownership negligently omitted this significant obligation to pay for HP's data deletion and other deliverables on behalf of CB&I.  This obligation was never disclosed in any way during due diligence [Besaw Expert Report], yet Zovy ownership was well aware of this costly liability [Exhibits 20, JJ LL, MM, NN, Grossman, deposition 2, page 360, line 16 to page 366, line 10].

Mr. Wheelin and Mrs. Reed repeatedly attempted to mislead the court by associating Zovy's undisclosed obligation to pay HP [for services HP provided CB&I] with reference to the actual disclosures in Zovy's separate CB&I contract.

Zovy's disclosed CB&I Contract was a one-time data migration project for the transfer of CB&I's data from HP's Digital Safe Archive to the Zovy Archive.  The services, including data deletion, that HP provided to CB&I in conjunction with Zovy's CB&I Contract was a separate engagement between HP and CB&I.  (Exhibits LL, MM, NN)  **However, Capax was never made aware of Zovy's unavoidable obligation to pay for those services on behalf of CB&I.**

In spite of Defendants attempts to mislead the court with various explanations for this negligent omission, we have demonstrated that this substantial obligation to pay HP [on behalf of CB&I] was never identified, stated, or referenced in any way in the CB&I Contract of May 2016, any financial disclosures, or anywhere else prior to closing of the EPA.  As noted, these obligations to pay HP [on behalf of CB&I] arose from a completely separate undisclosed contract between HP and CB&I. (Exhibits LL, MM, NN)

It is undeniable that this separate and unavoidable obligation to HP was known to Zovy ownership at the time the EPA was negotiated and closed.  This was not a mere oversight, and no amount of due diligence would ever have uncovered this negligent omission.

As proof of their prior knowledge of Zovy's undisclosed obligations to pay HP [on behalf of CB&I] , Mrs. Reed and Mr. Dibble created an internal memo dated May 31, 2016, outlining a part of their known obligation to HP.  April 19, 2021, Tr. at p. 94, ln 19 – p. 95, ln. 14; p. 111, ln. 19-23.

*"The data migration piece of the contract requires us to work with HP who has the division's historical data that is older than two years.  HP will receive $675k of the $1.375 million payment, which we negotiated to be paid monthly over a 12-month period as illustrated above." - Tim Dibble and Jessica Reed (Exhibit C, page 5, lines 6 - 9)*

Neither the substantial obligation to pay HP nor Zovy's internal memo concerning these obligations and costs were ever identified, disclosed, or provided to Capax during due diligence or at any time prior to the closing of the EPA.  In fact, they were purposely, or at best, negligently hidden from Capax.

While Zovy represented to Capax that it had substantial liabilities [which Capax took into full account in determining the actual cost of the acquisition], **the balance sheets provided in the Financial Statements incorporated within Schedule 5.8 of the EPA do not set forth, identify, or provide any indication or a reserve for this undisclosed and unavoidable obligation to HP**.  See Exh. 2.

On the provided Balance Sheet of July 31, 2016, the total $5,047,462 in liabilities disclosed to Capax by Zovy included $2.1 million owed to HP for software licenses; **however, no liabilities for or relating to the undisclosed obligation to pay HP [on behalf of CB&I] were identified, referenced, or disclosed.**  As consideration for the EPA, Capax assumed, in good faith, the veracity and completeness of the disclosed liabilities and obligations of Zovy.  April 19, 2021, Tr. at p. 80, ln. 19 – p. 81, ln. 1-18.

This indisputable obligation to pay HP [on behalf of CB&I] was also negligently omitted from Zovy's disclosed Material Contracts Schedule.  This obligation to pay HP [on behalf of CB&I] was an unavoidable cost that Capax was required to pay.  Had it been properly disclosed, this $1,628,000 liability would have substantially lowered the value of Zovy and the earn-out compensation under the EPA.  **The omission of these costly obligations to pay HP [on behalf of CB&I], regardless of the Defendants' intent, constitute a material breach of the EPA.**

Capax ultimately paid $614.759.39 to settle this omitted $1,628,000 obligation to HP (Exhibit 31).  Time and again, Mr. Wheelin attempted to use Capax's business acumen to obfuscate the Zovy ownership's misrepresentations and omissions.  However, the fact that Capax was able to negotiate a settlement with HP for this undisclosed obligation does not mitigate the damage of the Zovy ownership's omission nor does it obviate in any way their egregious and substantiated Breach of Contract.

### 2.  The Second Misrepresentation: The Zovy Assets

The Zovy ownership inflated Zovy's value by including assets they knew did not belong not Zovy's.  This is an incontestable misrepresentation and, if nothing else, the basis for a truth defense to the libel claim.

On the Balance Sheet of July 31, 2016, which Defendants provided during due diligence [Exhibit 2], it was stated that there were Fixed Assets of $1,033,141 [Exhibit 2, page 40].  Unfortunately, all of these stated Fixed Assets did not belong to Zovy.  **Unbeknownst to Capax at the time of closing of the EPA, $347,096 of this hardware was not owned by Zovy and was merely a fabricated asset.**  This misrepresentation increased Zovy's Fixed Assets by over 50% and inflated Zovy's value, and Defendants have no credible explanation or justification for this negligent misrepresentation.

Furthermore, CEO Chris Grossman knew full well that the hardware stated on the Balance Sheet as a $347,096 Fixed Asset was owned by the VA and not owned by Zovy.  This fact was well-known long before the due diligence period.

An email which was sent from Grossman [as the CEO of Zovy] to Karen Flowers and Dan Kapil of Thundercat on August 13, 2015, clearly states that the computer hardware that was presented to Capax as being an asset of Zovy's did indeed belong solely and fully to the VA.

*"Hardware would include all storage, servers, and software required for the operation, maintenance, support, and administration of the Archiving and eDiscovery solution from the specified VA data center.  All hardware will be property of the VA and will be supported and maintained by Zovy."* - *Chris Grossman, August 13, 2015 (Besaw Expert Report, page 8, lines 1-4)*

The express representations by Grossman to the VA acknowledging Zovy did not own this hardware firmly establishes that the fixed asset misrepresentations in the financial reports provided to Capax were, at a minimum, grossly negligent.  **Even if considered only negligence, and regardless of**

the Defendants' intent, this significant overstatement of assets constitutes a material breach of the EPA.

Additionally, had the purchase of the VA hardware been properly recorded as a $347,096 Cost of Goods Sold, it would have significantly reduced Zovy's profitability by $347,096 as well. (Kelly Besaw Expert Report, Page 7, line 28-33).

### 3.   The Third Misrepresentation: The Zovy Revenue Model

Zovy ownership misrepresented Zovy's business revenue model which dramatically inflated the value of Zovy.  Although the Zovy ownership clearly knew that over one-third of Zovy's revenue was coming from their less valuable one-time professional service engagements, they represented all of Zovy's revenue as coming from their considerably more valuable Software as a Service ["SaaS"] recurring revenue subscription-fee business.   Of particular significance, during the trial, this representation was reaffirmed with particular directness and clarity with regard to the CB&I Contract by Chris Grossman.  During due diligence, Chris Grossman stated emphatically that 100% of Zovy's revenue was SaaS [Exhibit S].  However, it is indisputable that the CB&I Contract was a one-time data migration project—and not a recurring SaaS revenue service.

*"That means that this year's revenue is 100% SaaS." - Chris Grossman, July 19, 2016 (Exhibit S, lines 11-12)*

As noted, Zovy entered into a substantial contract with CB&I on May 9, 2016  (the "CB&I Contract").  The value of this CB&I contract was an important component of Zovy's appeal to Capax. This contract, which was described as being for recurring revenue, added significant short-term and long-term value to Zovy.  April 19, 2021, Tr. at p. 94, ln. 25.

Defendants compounded their misrepresentation and omission of material liabilities and obligations associated with the CB&I by misrepresenting the revenue stream from the CB&I Contract to be recurring rather than non-recurring revenue.

Once again, this was not a mere oversight, and due diligence would not be expected to uncover this misrepresentation.

Additionally, proceedings in this case and the credible proof at trial established that Zovy's VA contract and relationship were materially different than Defendants represented to Plaintiffs prior to the

closing of the EPA.  The VA contract via Thundercat was not a subscription support contract for a cloud-based SaaS deployment of HPCA, but rather it was a support contract for an on-premise license-in-perpetuity for HPCA, which is a less secure and profitable contract than a SaaS contract.

The salient point is that a license-in-perpetuity does not have to be renewed, while a SaaS subscription-fee service needs to be renewed on a recurring basis if the customer wants to continue to access their data.  A data archive solution that is based on an on-premise license-in-perpetuity does not call for any further active engagement from the provider as the data being archived is in the customer's very own 'on-premise' data center, while a cloud archive solution, where the provider actually stores the customer's data in the provider's 'cloud' data center demands that the customer continues to pay for access to their data, this is what is known as Software as a Service ["SaaS"].

The Defendants' misrepresentation of this contract as a SaaS engagement continues to damage Capax.  Because of the fact that the VA has a perpetual license for HPCA, a fact which was never disclosed to Capax prior to the closing of EPA, the VA was, and remains, able to easily move on from Zovy support and award their maintenance and support contract to another fulfiller, which they have done.  It is unlikely that the VA would ever have been able to engage any provider other than Zovy to facilitate their HPCA archiving if it had indeed been a SaaS engagement as presented by the Defendants. The loss of this contract proved very costly to Capax.

Additionally, we now know through discovery, depositions, and trial testimony that the HPCA on-premise software license that Thundercat and Zovy sold to the VA was in fact not theirs to sell.  We now know through discovery, depositions, and trial testimony that the HPCA on-premise software license they sold was Capax's on-premise perpetual HPCA software  - and neither Zovy nor Thundercat was ever authorized to sell or deliver on-premise HPCA software licenses to the VA or any other customer for that matter.  While relevant to this action, this discovery will eventually need to be resolved by Thundercat, the VA, and anyone else involved in the unauthorized sale of on-premise HPCA to the VA.

**Although Mr. Ragusa was concerned about the actual means of calculation, he repeatedly stated that Capax had every intention of paying what was accurately owed on the VA earn-out.  To be clear, Capax never disputed the validity of the VA earnout.  The only reason payment was withheld is because of the recognition of Losses (as defined in the EPA) in connection with breaches**

**of representation and warranties, the sole remedy for which is setoff against the Earn-Out Consideration per Section 8.10 of the EPA.**

**Regardless, we now feel that the Zovy ownership's breach of the contract eliminates Capax's responsibility to any and all earnout agreements with the former Zovy ownership group.**

### D. <u>Due Diligence</u>

Defendants' response to their misrepresentations and omissions has been to argue that Capax did not do sufficient due diligence.  This is simply not true and, more importantly, is legally irrelevant to the question of whether there was a breach of the representations and warranties under the EPA.

It is true that Mr. Ragusa mistrusted Defendants and Mr. Dibble from the outset and repeatedly stated that he thought that Alta was hiding something.  He often queried his partners about why Defendants were, in his opinion, so anxious, especially Mr. Grossman, to sell Zovy for only $1.

Mr. McGrath assured Mr. Ragusa that the appropriate due diligence was being performed and that Defendants were providing Capax with full representations and warranties in the EPA as to the financial statements, material contracts, assets, liabilities, and obligations of Zovy.

**No amount of due diligence would be expected to uncover that which is being knowingly withheld and knowingly misstated.**

Mr. McGrath conducted a thorough due diligence review, and it was his ongoing review of the Zovy business after the purchase that led to the unraveling of Defendants' misrepresentations and omissions which are a breach of the representations and warranties in the EPA.

### E. <u>Anthony Ragusa</u>

As for Mr. Ragusa, his record of restoring businesses is remarkable.  He has been able throughout his 42-year career to recognize the inherent value and grow businesses creating jobs and significant opportunities, as well as increasing shareholder value.

At Mr. Baiocco's urging, Mr. Ragusa supported the purchase of HPCA from Hewlett Packard, and this led to the opportunity to acquire Zovy for a fair price of what Mr. Ragusa considered to be $3.8M.

Mr. Wheelin repeatedly tried to mislead the court by using Mr. Ragusa's business acumen and success at building and growing a variety of businesses as evidence that he had a nefarious desire to buy

Zovy [which somehow obviated the Zovy ownerships misrepresentations and omissions].  To proffer that Mr. Ragusa instigated this civil action because he wanted to sell HPCA/Zovy is nonsensical.  No reasonable business leader would instigate a lawsuit if they intended to sell their business or attract investors.  Ongoing litigation is often seen as a poison pill in any due diligence.

In fact, Mr. Ragusa believed that Zovy's cloud Software as a Service ["SaaS"] would be the sizzle Capax's newly acquired HPCA needed to exponentially increase HPCA's value.  And he may, ultimately, be right.  Mr. Ragusa may at some point in the future be fortunate to sell HPCA along with Zovy at a remarkable multiple.  But that is not what is in question here.  Mr. Ragusa's strategies for growth [or success in doing so] do not obviate Zovy ownership's responsibilities or mitigate their Breach of Contract.

Mr. Ragusa supported this civil action because he was convinced, as we have substantially proved, that the Defendants in general - and Timothy Dibble, Jessica Reed, and Chris Grossman in particular - had knowingly and repeatedly lied to hide liabilities and obligations, fabricate assets, and misrepresent the nature and value of the Zovy business revenue model and its potential profitability.  This all represented fraud to Mr. Ragusa, and it was publicly claimed as such in Capax's civil action.  Mr. Ragusa's ill-advised fraud alert did not state anything that was not publicly revealed in our civil complaint and, frankly, it generated no discernable damages or negative impact.

Mr. Ragusa, however, has been the target of Mr. Wheelin's defense and debasement.  His unfair characterization of Mr. Ragusa is merely an attempt to obviate the facts of this case.

In regards to the VA, there is one more point that calls for additional clarity.  Mr. Wheelin once again tried to embarrass and humiliate Mr. Ragusa by saying that he misled a judge with the following statement in Mr. Ragusa's well-received letter to Judge Borrok on December 6, 2020:

"Currently, our Unified Global Archiving's Zovy Cloud provides the data archiving resources for the Veterans Administration and clients such as the Bank of Tokyo worldwide."

It is without a doubt that the VA continues to unabashedly and effectively utilize Capax and Zovy's EAS and HPCA archive solutions.  Mr. Ragusa is justly proud of the fact that his businesses not only developed the first FedRAMP authorized Federal Cloud platform for the United States Government, but that the VA continues to utilize his market-leading EAS and HPCA archive solutions.

When asked "Who utilizes your archive solutions?"  Mr. Ragusa proudly mentions a variety of over 250 enterprise customers worldwide [ranging from the Standard Chartered Bank of Singapore to Lloyd's Bank of London to Latham Watkins to Palm Beach County to Ohio State University to Kirkland & Ellis to the City of San Diego to Bank of Tokyo to Ropes & Gray to Valero to Choate Hall, etc.] regardless of whether they are active revenue-generating accounts or not.

And regardless of Mr. Ragusa's business acumen and future plans for HPCA and Zovy, the failure to disclose the obligations to pay HP [on behalf of CB&I],  together with the misrepresentation of the business model and misrepresentation of the VA hardware as being an asset of Zovy, provide a complete defense to the libel claim against Mr. Ragusa.  The libel claim should be dismissed.

## F.   Conclusion

My clients and I are confident that we have clearly substantiated our claim that the Defendants knowingly, or at the very least, negligently, misled Capax prior to the closing of the EPA.  My clients' original claim that Zovy's misrepresentations and omissions were a well-coordinated and fraudulent subterfuge [intended solely to hide enormous liabilities and obligations, inflate the value of Zovy and its potential profitability, and effectively consummate the deal] is not relevant to the proof necessary for a Breach of Contract ruling.  Intent is not at issue here.

As Mr. Ragusa demonstrated in his analogy, this transaction was akin to buying a house along with all of its furniture for $1 and the assumption of the mortgage for $3,800,000, only to find out that someone else owns the furniture and the assumed mortgage is for $7,000,000, not $3,800,000.

Plaintiffs respectfully request that the Court, after considering the credible evidence, conclude that Defendants' misrepresentation and concealment of liabilities and obligations to pay HP [on behalf of CB&I], failure to disclose these obligations on the material contract schedule, and mischaracterization of the CB&I and VA revenue as SaaS each separately constitute violations of the representations and warranties in the EPA and Breach of Contract that excused Plaintiffs' performance [i.e., the VA earn-out obligation].

We are confident that your honor will recognize these negligent and damaging misrepresentations and omissions as well Defendant's full and irrefutable Breach of Contract regardless of Defendants' intent.

<u>**PROPOSED FINDINGS OF FACT**</u>

**A. <u>Background</u>**

1.     The disputed claims between the parties arising out of an Equity Purchase Agreement dated September 23, 2016 (the "EPA") between plaintiff Capax Discovery, Inc. ("Capax") and defendants Zovy, LLC, ("Zovy"), Zovy Management, LLC ("Zovy Management"), Zovy Incentive, LLC ("Zovy Incentive"), and AEP RSD Investors, LLC ("AEP").

2.     Capax is a purchaser of membership units of Zovy under the EPA.

3.     Zovy Management, Zovy Incentive, and AEP were all of the members of Zovy (the "Members"), and the sellers under the EPA.

4.     Zovy and the Members are responsible for the representations and warranties provided to Capax in connection with the EPA.

5.     Prior to the EPA, Capax and Zovy were direct competitors with one another for enterprise data archiving and related data management services.

6.     The primary distinction between Capax and Zovy's data archiving offerings was that Capax provided on-premise archive solutions [whereas the customer stores their data on-premise in their own data center through the one-time license purchase of Capax's archiving software] while Zovy provided cloud-hosted SaaS archive solutions [whereas the customer stores their data in Zovy's data center through a recurring subscription-fee service for both the archiving software and data storage]. "Hosted services" is the general term for technology services provided by using servers located outside the customer's physical location.  April 19, 2021, Tr. at p. 78, ln. 1-17.

7.     The fundamental difference between cloud vs on-premise archiving software is where the archiving software physically resides as well as how it is paid for.  On-premise archiving software is installed locally on the customer's servers, where cloud archiving software is hosted on the provider's servers and remotely accessed by the customer via the internet.  This is commonly referred to as SaaS.

        With an on-premise solution, the customer makes a one-time payment for the software

license from the provider, and the software is installed on the customer's own servers - and the customer determines how it will be managed, supported, and maintained.  With a hosted solution, the customer makes recurring subscription-fee software license payments to the provider for the provider's ongoing archiving, management, support, and maintenance of the customer's data [SaaS].  In a hosted solution, the customer does not own the license to the software or the provider's servers used to facilitate the data services.

8.      Zovy's cloud-hosted archiving service was based upon  - and fully dependent on - Hewlett-Packard Consolidated Archive ("HPCA") software.

**9.      In 2016, Capax acquired HPCA, giving Capax complete control over all HPCA software licenses and customers worldwide, including the essential HPCA software license under which Zovy's archiving services operated.**

10.     Through Capax's acquisition of HPCA, Zovy became a significant customer of Capax. Capax now provided the license, support, and maintenance for the HPCA software that Zovy was utilizing as the foundation of their cloud-hosted archiving solution.

11.     In mid-2016, John Baiocco contacted the newly acquired HPCA customers, one of which was Chris Grossman.  Chris Grossman was the CEO and minority owner of Zovy.

12.     At Mr. Grossman's suggestion, Mr. Baiocco and his partners began considering Zovy for acquisition by Capax, which subsequently led to an equity purchase agreement.

13.     Once an agreement was reached between the parties after extensive negotiations, there was a due diligence period between Capax and Zovy.  Due diligence items, such as historical financial information, contracts, obligations, and pro forma projections were assembled and produced by Zovy to Capax on July 19, 2016. See Exh. 21; April 19, 2021, Tr. at p. 9, ln.

14.     Based on the full examination and acceptance in good faith of Zovy's disclosures, Capax purchased all of the equity/membership units of Zovy from the Members pursuant to the EPA.  See Exh. 1, 2;

15.     Capax's acquisition of Zovy closed on September 23, 2016.

**B.   The Equity Purchase Agreement**

16.     The EPA is governed by New York law.

17.     The EPA contains a general merger clause, but the EPA does not include a specific

disclaimer of the existence of, or reliance upon, representations and warranties.  See Exh. 1, § 9.4

**18.     Section 5.6 of the EPA provides that Zovy has no "liabilities or <u>obligations</u> that would**

**reasonably be expected to have a Material Adverse Effect on the Company, the Business, or the**

**assets of the Company, except for those set forth or adequately reserved against on the balance**

**sheets contained in the Financial Statements . . . ."** Exh. 1, § 5.6 (emphasis added).

19.     The representations and warranties in Sections 5.8, 5.9, and 5.16 are <u>not</u> delimited by a

standard of the "Knowledge" of the Defendants, though other representations and warranties in the EPA

are delimited by such a standard. <u>Compare</u> Exh. 1, §§ 5.8, 5.9, 5.16 <u>with</u> §§ 5.15.2-5.15.5.

20.     Michael McGrath, Chief Financial Officer of Capax, performed due diligence with respect

to Zovy in July, August, and September 2016, the three months leading up to the acquisition. April 19,

2021, Tr. at p. 74, ln. 1-5.  This included a thorough examination of the contracts, obligations, and

financial schedules provided by Zovy, asking questions of management and ownership, and receiving

responses from Zovy.  April 19, 2021, Tr. at p. 77, ln. 1-25.

21.     While deciding to proceed with the EPA, Capax relied upon Zovy's representations,

disclosures, and warranties in evaluating the stated value and financial performance of the Zovy business,

its recurring revenue subscription-fee business model, as well as Zovy's assets, liabilities, and

obligations.

### C.     <u>Trial Issues Concerning Breach of EPA and Misrepresentations</u>

22.     The Court entered an Opinion and Order on September 30, 2020, on the parties' respective

motions for summary judgment pursuant to which Plaintiffs' claims for damages based on breach of the

EPA and misrepresentations were dismissed, and Plaintiffs' claims for breach and misrepresentation were

allowed to proceed to trial solely as to whether such claims, if sustained, supported a defense that

excused Plaintiffs' performance under the EPA.

23.     At trial, Plaintiffs' claims for breach of the EPA and misrepresentation were, based on the

Court's summary judgment rulings, limited to issues concerning the nature, value, and liabilities of

Zovy's undisclosed and substantial contractual obligation to pay HP [on behalf of CB&I] as a defense to

Defendants claims for Breach of Contract and libel. [See, e.g., cite discussion/objections re libel defense on the record]

24.     **Plaintiffs' expert Kelly Besaw, CPA, CVA was, based on the objection of Defendants' counsel, determined to be only a damages expert and precluded from testifying at trial in support of Capax's claim of misrepresentations and omissions as proof of the Defendants' breach of contract and in support of Mr. Ragusa's defense of the libel claim.**

**D.  Defendants Breached Representations and Warranties in the EPA: <u>Material Misrepresentations Concerning Undisclosed Obligations and Misrepresented Assets</u>**

25.     Plaintiffs' trial proof establishes that the Defendants failed to disclose Zovy's material obligation to pay HP [on behalf of CB&I].

26.     Plaintiffs alleged and through a preponderance of evidence demonstrated $1,628,000 of undisclosed expenses relating to this undisclosed obligation to pay HP [on behalf of CB&I].  This undisclosed obligation consisted of $745,000 for monthly support charges by HP covering the period thru May 2017.  This undisclosed obligation also included a data deletion liability of $883,000 pursuant to Autonomy Order Form No. 1, an undisclosed contract.

27.     The "Material Contracts" Disclosure Schedule is Schedule 5.16. See Exh. 2.

28.     The "Material Contracts" representation and warranty in Section 5.16 of the EPA required all contracts with an "annual receipt by the Company" of at least $100,000 to be disclosed as "Annual Receipts Contracts." See Exh. 1, § 5.16.

29.     The "Material Contracts" representation and warranty in Section 5.16 of the EPA required all contracts with an "annual expense to the Company" of more than $5,000 or a "one-time cost to the Company" of more than $7,500 to be disclosed as "Annual Expense Contracts." See Exh. 1, § 5.16.

30.     The CB&I Contract of May 9, 2016, was disclosed as an "Annual Receipts Contract" and did not address, identify, or reference the undisclosed Zovy obligation to pay HP [on behalf of CB&I]. See Exh. 2; April 19, 2021, Tr. at p. 94, ln. 12 – p. 94, ln. 1-5.

31.     The undisclosed Zovy obligation to pay HP [on behalf of CB&I] was never identified or referenced on the "Annual Expense Contract" disclosure schedule. See Exh. 2; April 19, 2021, Tr. at p. 94, ln. 12 – p. 94, ln. 1-5.

32.     Mr. McGrath relied upon the disclosures in Schedule 5.16 (Material Contract) of the EPA in concluding that the CB&I Contract did not have a cost impact on Zovy.  For Mr. McGrath and Capax, there was no way of knowing that there was a substantial Zovy obligation to pay HP [on behalf of CB&I] as it was deliberately withheld.  April 19, 2021, Tr. at p. 98, ln. 21-25; p. 104, ln. 6-13.

**33.     The undisclosed Zovy obligation to pay HP [on behalf of CB&I] is a separate legal obligation from the disclosed obligations of the CB&I Contract by which Zovy provides services to CB&I.  April 19, 2021, Tr. at p. 96, ln. 19-22.**

34.     Capax was not aware of this substantial obligation to pay HP [on behalf of CB&I] prior to the closing of the EPA. April 19, 2021, Tr. at p. 98, ln. 13-20; p. 108, ln. 22 – p. 109, ln. 6.

35.      In assessing the transaction, Capax also relied upon the statement in the CB&I Contract which clearly stated that there were no obligations to HP.  See Exh. A; April 19, 2021, Tr. at p. 100,  ln. 2-6.

36.     It is undisputed that the substantial obligation to pay HP [on behalf of CB&I] was not identified or otherwise disclosed by Defendants at any time prior to the acquisition.

37.     The undisclosed obligation to pay HP [on behalf of CB&I] was discovered by Capax after the closing date - and only when HP began requesting payment from Zovy for the undisclosed obligation. April 19, 2021, Tr. at p. 95, ln. 9-18.

38.     Defendants misrepresented material aspects of the CB&I Contract, including failing to disclose an associated obligation to pay HP [on behalf of CB&I] and also misrepresenting the contract as recurring SaaS engagement rather than a non-recurring one-time fixed fee engagement.

39.     As a result of requests for clarification sought by Mr. McGrath during the course of due diligence, Zovy re-classified the CB&I Contract on the company's deferred revenue schedule as a "subscription" contract. April 19, 2021, Tr. at p. 85, ln. 3 – p. 86, ln. 10.  Zovy represented the CB&I Contract's fixed fee of $1,375,000 as an annual recurring revenue stream rather than the one-time project revenue that it was.


**E.     Defendants' "Explanation" Defense for CB&I Misrepresentations**

40.     One of the main issues left at trial concerned the negligent omission of Zovy's obligation to pay HP [on behalf of CB&I].  At trial, Defendants did not offer any credible evidence to dispute Zovy ownership's costly negligence or that Capax incurred liabilities of $1,628,000 related to this negligence.

41.     Defendant Jessica Reed testified that Defendants did disclose a portion of the CB&I Expenses, albeit in a non-specific, generic manner.  Mrs. Reed's testimony was, however, entirely refuted by text messages wherein she acknowledged the failure to disclose expenses related to the CB&I relationship and concerns for liability to Capax.

42.     In her testimony, Mrs. Reed attempted to mislead the court by proffering that the Defendants increased expenses in the Profit & Loss projection provided to Capax by $56,250 commencing in August 2016 (with a projected annualized cost increase of $675,000) to account for the dramatic cost increases associated with the Zovy obligation to HP [on behalf of CB&I].

43.     Mrs. Reed's testimony referenced the line item in the Profit & Loss projection under Cost of Goods Sold and titled "5000 – Software, Data Center Infrastructure." See Exh. 21; April 19, 2021, Tr. at p. 105, ln. 25 – p. 106, ln. 5; p. 107, ln. 3-7.  This line item indicates that monthly expenses under this category were represented to be $142,523.41for January thru July 2016, and projected to increase to $198,783.47 per month for August thru December 2016.  **Neither this line item nor any of the notes on the Profit and Loss projection connect these costs in any way to the CB&I Contract or the undisclosed Zovy obligation to HP [on behalf of CB&I] arising from a separate contract.**

44.     Mrs. Reed's trial testimony that they had indeed disclosed Zovy's obligation to pay HP was not credible for the following reasons.

> i.    **First**, the HP data deletion and monthly support services which Zovy was obligated to pay on behalf of CB&I were totally different types of services easily distinguished from the unrelated infrastructure upgrades as referenced by Mrs. Reed in line item 5000 in the Profit and Loss projection.  Mr. Wheelin and Mrs. Reed attempted to mislead the court by passing off this unrelated infrastructure upgrade cost as evidence of the disclosure of Zovy's undisclosed obligations to HP. April 19, 2021, Tr. at p. 115, ln. 16-19.
>
> ii.   **Second**, Mrs. Reed's own text messages admit concern about the costly liability for failing to disclose these obligations.

iii. **Third**, Mrs. Reed's testimony was inconsistent with the direct statements of Zovy CEO Chris Grossman made with the production of the Profit and Loss projection. In a July 19, 2016, e-mail attaching the Profit & Loss projection, Mr. Grossman indicated clearly that "Data center upgrades are factored in <u>on a formula</u> although none are currently needed." Absolutely no reference was made to the Zovy obligation to HP for services provided to CB&I.  Rather he clearly stated it was simply a non-specific, formulaic projection.  <u>See</u> Exh. 21 (emphasis added); April 19, 2021, Tr. at p. 97, ln. 22 – p. 98, ln. 6; p. 104, ln. 20 – p. 105, ln. 4; p. 105, ln. 25 – p. 106, ln. 5; p. 107, ln. 3-7.

45.     In the Fall of 2016 after the closing, Mr. McGrath unexpectedly began to receive requests for payment from HP.  April 19, 2021, Tr. at p. 89, ln. 11-20; p. 93, ln. 5-11.  Mr. McGrath then inquired about the CB&I-related HP invoices with Mrs. Reed. April 19, 2021, Tr. at p. 93, ln. 12 – p. 94, ln. 1-5.

46.     In January 2017, via e-mail, Mr. McGrath called to the attention of Mrs. Reed his concern that there were certain significant undisclosed contracts, liabilities, and obligations in connection with data deletion services provided by HP. <u>Id</u>.

47.     In response to Mr. McGrath's inquiry to Mrs. Reed, Tim Alexson responded that it was common for Mr. Grossman and Alex McMurchie to sign contracts and not provide them to AEP.  <u>Id.</u>

48.     Despite alleging that all material liabilities had been disclosed, the Defendants were eventually able to locate the underlying contract between HP and CB&I pertaining to the HP data deletion.  April 19, 2021, Tr. at 95, ln. 1-14.

49.     **On March 10, 2017, two months after Mr. McGrath made Mrs. Reed aware of the undisclosed obligations to HP [on behalf of CB&I], Mrs. Reed asked Mr. Grossman to obtain a written representation from CB&I that there were no expected data deletion costs to HP.  As shown in** Exhibit PP, page 1.  Chris Grossman in the blue text box and Jessica Reed in the clear text box.

Any way you can get CB&I to put something in writing about the data deletion?

> Until the project is complete I feel it would be a difficult conversation out of no where.

> It isn't something on their radar rather something from the reading of a contract.

Could you say it is a question as part of the audit?  I'm sure Mike is going to ask you the same.  With the uncertainty still out there, I think this may cost us $300k off of the earnout.  I will keep researching if there is another way to get around it.

> Let me think how we could potentially do it.
>
> Delivered

50.     In the above communication (Exhibit PP, page 1), Mrs. Reed tellingly states that the failure to disclose the HP data deletion costs could cost Defendants $300,00 off their earn-out.  This was not, as Mrs. Reed stated, her attempt to better research these costs, but rather it was a bold attempt by Mrs. Reed to entice Mr. Grossman to secure support from CB&I to eliminate the Zovy ownership's financial exposure.  Even though Mr. Grossman, as a member of the Zovy ownership group, would also suffer from these undisclosed costs, he told Mrs. Reed that he could not help her out with her request.

51.     In such communication, Ms. Reed stated that the failure to disclose the HP data deletion costs could cost the Members $300,00 off the Earn-Out Consideration. June 10, 2021, Tr. at p. 36, ln. 17 – p. 37, ln. 12.

52.     Ms. Reed only conceded that she made such statement to Mr. Grossman upon the Court asking her for a direct yes or no answer:

> THE COURT: So the answer to the question is yes or no and it is did you have -- or did you ask him or did you tell him it was going to cost $300,000 off the earn-out.
>
> WITNESS: Yes. I believe I told him it could cost but that was the nature of it, yup.
>
> [June 10, 2021, Tr. at p. 37, ln. 7-12]

53.     In the same text communication, Ms. Reed stated that she was "look for a way around" the potential $300,000 impact to the Earn-Out Consideration.

54.     Ms. Reed never clearly answered why she sent the aforesaid text message to Mr. Grossman if the HP data deletion costs had been disclosed as Defendants contend, a point noted by the Court twice:

> *Q. If you disclosed it why did you think you were going to have to pay something off of the*
> *earn-out?*
> *MR. WHEELIN: Objection. Misstates testimony.*
> *THE COURT: I'm going to allow it. I think the witness has kind of answered it but it's not clear*
> *entirely to me and I'm the finder of fact so I'll allow the question.*
> *[June 10, 2021 Tr. at p. 40, ln. 19 – p. 41, ln. 1]*
> *THE COURT: Okay.*
> *Q. There's just one thing there's a question that kind of sticks with me. I guess what I don't*
> *understand yet is why is it, Mrs. Reed, you were looking for a way around it if the costs were*
> *supposed to be zero and you thought you disclosed it, what could CB&I have provided you that*
> *would have found you with a way around it? I don't understand the way around it part.*
> *[Id. at p. 43, ln. 8-16].*

55.     In sum, the commitment and obligation to pay HP [on behalf of CB&I] associated with the CB&I relationship were misrepresented and understated by $1,628,000, and the Defendants (especially Mrs. Reed), when confronted with these facts post-closing, made statements and engaged in a pattern of questionable behavior acknowledging their negligent failure to disclose this substantial liability.

### F.   Defendants Failed to Establish a Claim of Libel

56.     Defendants' sole claim of libel arises from publication of the "fraud alert."

57.     Defendants failed to demonstrate the "fraud alert" was materially false.

58.     Defendants established no economic or pecuniary injury arising from the publication of the fraud alert.

59.     Mr. Ragusa published the "fraud alert" in response to the discovery of the undisclosed HP obligations, falsified assets, misrepresentation of Zovy's revenue model, and other inconsistencies with

the representations and warranties in the EPA.

**G.  Capax Did Not Delay Payment on the VA Contract From 2016 to 2017.**

60.     In spite of Mr. Wheelin's assertion of nefarious intent on the part of Mr. McGrath and Capax to delay VA payments to manipulate Zovy ownership's earnout, Mr. McGrath supposed delay did not in any way impact the earnout schedule.

61.     Since the VA contract in question closed on December 7, 2017, that date, December 7, 2017, was the earliest possible date that Zovy could invoice Thundercat for the $770,000 due from the VA. April 19, 2021, Tr. at p. 58, ln. 9-20.  From there, it was Thundercat's responsibility to invoice the VA for $770,000.

62.     Once invoiced by Thundercat, the VA would remit payments to Thundercat.  From there, Thundercat would remit payment to Zovy. April 19, 2021, Tr. at p. 59, ln. 1-7.

63.     Therefore, based on the ability to actually create an invoice for Thundercat, as well as the typical payment patterns of the VA and Thundercat, payment would not have been received by Zovy in the calendar year 2017 even if the $770,000 invoice had been submitted on December 7, 2017.  April 19, 2021, Tr. at p. 57, ln. 17 – p. 58, ln. 5.

## PROPOSED CONCLUSIONS OF LAW

**A.     Capax Has Established a Valid Defense for Breach of Contract, Thereby Excusing It From Paying the Earn-Out Consideration**

1.     Under New York law, the elements of a cause of action for Breach of Contract include: (1) the existence of a contract; (2) performance by the plaintiff; (3) failure by the defendant to perform; and (4) resulting damages. Couns. Fin. Servs., LLC v. Melkersen L., P.C., 602 F. Supp. 2d 448, 452 (W.D.N.Y. 2009).

2.     Under New York law, a party's performance under a contract is excused where the other party has committed a material breach.  Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 136 (2d Cir. 2016).

3.     A material breach is one that goes "to the root of the agreement."  Id.

4.      The $1.628 million liability associated with HP data deletion costs had a "Material Adverse Effect" on Plaintiffs Zovy,  and was not "set forth or adequately reserved against on the balance sheets contained in the financial statements . . . ." Exh. 1, § 5.9.

5.      In light of the cost impact to Zovy, the expense obligations associated with the CB&I relationship should have been disclosed as both an Annual Expense Contract and Annual Receipts Contract on Schedule 5.16 of the EPA.  Therefore, Defendants were in breach of the representations and warranties of the EPA.

6.      Defendants' breaches of representations and warranties were material because they defeated Capax's bargained-for expectations of the financial condition of Zovy, resulting in $1.628 million in additional liabilities above the $3.8 million that had been disclosed. See Trodale Holdings LLC v. Bristol Healthcare Invs., L.P., No. 16 CIV. 4254 (KPF), 2019 WL 1300335, at *14 (S.D.N.Y. Mar. 21, 2019) (holding breaches of representations and warranties in Asset Purchase Agreement to be material).

7.      Defendants' misrepresentation is a material breach such that they have failed to prove their claim for Breach of Contract.

8.      Capax is excused from paying the Earn-Out Consideration based on the material breach by Defendants.

9.      Capax is entitled to an award of attorney's fees under Article 8 of the EPA as a result of the breaches of the representations and warranties in the EPA.[1]


**B.      Seller's Breach Preceded any Alleged Breach by Plaintiffs'**

10.     By virtue of the false representations and warranties, Defendants committed the first material breach of the EPA as of September 23, 2016, the date the EPA was signed and the transaction closed. See Exh. 1.

11.     By settling the $1.628 million obligation and paying $675,000 in connection with same, Capax incurred "Losses" for which it is entitled to indemnification from Purchasers pursuant to Section 8.2 of the EPA. Id.

---

[1] Alternatively, to the extent Capax is excused from paying a maximum of $300,000 of the Earn-Out Consideration by operation of Section 8.9.2 of the EPA, there is no "prevailing party" entitling either party to attorney's fees.

12.     By virtue of Defendants having committed the first material breach of the EPA, pursuant to Section 8.10 of the EPA, Capax was justified in withholding payment of the Earn-Out Consideration as setoff of "Losses" under the indemnification clause.

**C.      Defendants' Due Diligence Argument is Irrelevant**

13.     The Breach of Contract by Defendants, which emanates from false representations and warranties in the EPA, is not excused by the manner in which Capax performed due diligence on the transaction.

14.     The amount of due diligence performed by Capax is irrelevant to the question of whether there was a breach of the representations and warranties in the EPA, which must be enforced as written. W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990).

15.     Capax reasonably relied upon the Financial Statements, Absence of Undisclosed Liabilities, and Material Contracts representations and warranties, which sophisticated commercial entities may do in lieu of more detailed due diligence.  DDJ Mgmt., LLC v. Rhone Grp. L.L.C., 15 N.Y.3d 147, 154 (2010) (despite "hints from which plaintiffs might have been put on their guard in this transaction," plaintiffs were not required to "to conduct their own audit or to subject the preparers of the financial statements to detailed questioning" where the plaintiffs obtained written representations).

16.     In light of the representations and warranties, Capax was not required to exhaustively probe the disclosures by Zovy to determine whether any liabilities otherwise not disclosed in the EPA existed or that the stated Fixed Assets were not as presented. Id.

17.     In addition, from Capax's reasonable diligence, it was not apparent that the data and infrastructure cost increase of $56,250 per month built into the Profit & Loss Projection in any way pertained to a $1.628 million obligation, as the nature and extent of this liability was peculiarly within the knowledge of Defendants. Greenfield v. Shapiro, 106 F. Supp. 2d 535, 539 (S.D.N.Y. 2000).

**D.      Defendants' Representations were Absolute and NOT  Conditioned on Knowledge**

18.     Any suggestion by Defendants that the misrepresentation of their Fixed Assets or their failure to disclose the expense obligations and/or liabilities associated with the CB&I relationship were inadvertent or consistent with what was known at the time is irrelevant to whether or not a Breach of

Contract existed, due to the fact that the applicable representations and warranties were not delimited by a "Knowledge" standard. Exh. 1, §§ 5.6, 5.9, 5.16.

19.     The representations are unambiguous, and the Court should not insert terms in a contract under the guise of contractual interpretation. <u>Penavic v. Penavic</u>, 88 A.D.3d 671, 672, 930 N.Y.S.2d 634, 636 (2011).

**E.     <u>Damages Limitations Do Not Apply to Grossly Negligent or Reckless</u> <u>Misrepresentation</u>**

20.     A provision limiting damages may not insulate a party from "willful acts" or "gross negligence." <u>Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.</u>, 84 N.Y.2d 430, 438, 643 N.E.2d 504, 508 (1994).

21.     The nature of the failure to disclose the significant expense obligations associated with the CB&I relationship, along with the $347,096 misrepresentation of the Fixed assets, the $300,000 cap on indemnification should be set aside as an unlawful exculpatory provision.

**F.     <u>Defendants Have Failed to Establish Plaintiffs' Liability for Libel</u>**

22.     Under New York law, a plaintiff must establish five elements to recover in libel: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face). <u>Celle v. Filipino Rep. Enterprises Inc.</u>, 209 F.3d 163, 176 (2d Cir. 2000).

23.     Defendants have not carried their burden in proving liability in connection with their libel claim because the statements in the "fraud alert" were substantially true, thereby negating the required element of falsity. <u>Tannerite Sports, LLC v. NBCUniversal News Grp.</u>, 864 F.3d 236, 242 (2d Cir. 2017) ("[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." (citations omitted)).

24.     The libel claim must also be dismissed because Defendants failed to furnish any evidence at trial of special damages arising from the publication of the "fraud alert," including the failure to provide any evidence of economic or pecuniary damages.  In light of the lack of evidence of special damages, Defendants have not proven liability in connection with their libel claim because, at best, they

established only one instance of defamation in the "fraud alert" which is not actionable under New York's "single instance rule." <u>Celle v. Filipino Rep. Enterprises Inc.</u>, 209 F.3d 163, 180 (2d Cir. 2000).

## G.    <u>Defendants Have Not Proven Entitlement to Punitive Damages</u>

25.     Defendants have not established their entitlement to punitive damages in connection with their Breach of Contract claim because absent Breach of Contract also rising to the level of tort, punitive damages are unavailable under New York law even where intentional or malicious conduct is established. <u>Thyssen, Inc. v. S.S. Fortune Star</u>, 777 F.2d 57, 63 (2d Cir. 1985).

26.     Defendants have not established any conduct by the counterclaim-defendants rising to the level of tort, therefore, punitive damages may not be granted.

27.     Additionally, Section 8.9.3 of the EPA provides a disclaimer that excludes and bars an award of punitive damages.  Contractual limitations on remedies will be enforced as long as they are not unconscionable.  <u>Wilson Trading Corp. v. David Ferguson, Ltd.</u>, 23 N.Y.2d 398, 403 (1968).  Defendants have failed to establish that Section 8.9.3 of the EPA is unconscionable.

28.     Finally, at trial, counsel for Plaintiffs objected to the introduction of evidence in support of punitive damages, *inter alia*, on the basis that such damages had not been pleaded.  April 29, 2021 Tr. at p. 67, ln. 1-13. Counsel for Defendants responded by asserting that there is no requirement in Fed. R. Civ. P. 13 requiring punitive damages to be specifically pleaded.  However, a claim for punitive damages must be disclosed pursuant to Fed. R. Civ. P. 26(a) or such evidence is precluded pursuant to Fed. R. Civ. P. 37(c).  <u>Williams v. Boulevard Lines, Inc.</u>, No. 10 CIV. 2924 DF, 2013 WL 5652589, at *4 (S.D.N.Y. Sept. 30, 2013) (precluding evidence in support of claim for punitive damages where "Plaintiff's Rule 26(a) disclosure failed to make any mention, whatsoever, of punitive damages.").  Therefore, Defendants are foreclosed from pursuing punitive damages.

WHEREFORE, Plaintiffs respectfully request that the Court find, regardless of Defendants' intent, that as a Breach of Contract, Defendants breached the Equity Purchase Agreement's Representations and Warranties relating to Zovy's financial condition and obligations, specifically including the details related to the CB&I relationship, in an amount not less than $614.759.39 [i.e., the negotiated settlement of the undisclosed $1,628,000 HP liability] and the misstatement of Fixed Assets in the amount of $347,096,

such that under applicable New York law Plaintiffs' performance/payment under the Equity Purchase Agreement is excused or, in the alternative, reduced by $300,000.

Dated: July 19th, 2021                                        Respectfully Submitted,

                                                             _____*s/ Robert E. Gallagher, Jr.*_____

                                                             Robert E. Gallagher, Jr.
                                                             *Attorney for Plaintiffs/Counterclaim Defts*
                                                             5110 Main Street, Suite 217
                                                             Williamsville, NY 14221
                                                             716.796.5415
                                                             rgallagher@advantageglobalresources.com

---

**CERTIFICATION OF SERVICE**

I hereby certify that on this 19th day of July, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

                                                             _____*Isl Robert E. Gallagher, Jr.*_____

                                                             Robert E. Gallagher, Jr.