UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPAX DISCOVERY, INC., WALKER GLOBAL SOLUTIONS NAPLES, INC., JOHN BAIOCCO, WYNN HOLDINGS, LLC, THOMSON FEDERAL SOLUTIONS, LLC, Plaintiffs, v. AEP RSD INVESTORS, LLC, ZOVY MANAGEMENT LLC, ZOVY INCENTIVE LLC, ALTA EQUITY PARTNERS I MANAGERS, LLC, JESSICA REED, TIMOTHY DIBBLE, TIMOTHY ALEXSON, and GRACE CONNELLY, Defendants/Counterclaim Plaintiffs, v. CAPAX DISCOVERY, INC. and ANTHONY J. RAGUSA a/k/a TONY WALKER, Counterclaim Defendants. | Case No. 1:17-cv-00500-CCR |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ENTRY OF JUDGMENT**

This case arises out of the acquisition of Zovy LLC ("Zovy") by Plaintiff Capax Discovery, Inc. ("Capax") in September 2016. In their Amended Verified Complaint, Plaintiffs Capax, Walker Global Solutions Naples, Inc., John Baiocco, Wynn Holdings, LLC, and Thomson Federal Solutions, LLC (collectively, "Plaintiffs") sought equitable rescission of the September 23, 2016 Equity Purchase Agreement (the "EPA") between

the parties[1] and asserted claims of fraudulent inducement, negligent misrepresentation, and breach of contract.

Defendants AEP RSD Investors, LLC ("AEP"), Zovy Management LLC ("Zovy Management"), Zovy Incentive LLC ("Zovy Incentive"), Alta Equity Partners I Managers, LLC ("Alta"), Timothy Dibble, Jessica Reed, Timothy Alexson, and Grace Connelly (collectively, "Defendants") counterclaimed for breach of contract against Capax and libel against Capax and Anthony Ragusa, one of Capax's principals.

On September 30, 2020, in response to the parties' cross-motions for summary judgment, the court issued a Summary Judgment Opinion and Order (Doc. 97) (the "Summary Judgment Decision") in which it granted summary judgment in Defendants' favor on each of Plaintiffs' claims. The court further held that Plaintiffs are liable for breach of the EPA because they failed to pay Defendants thereunder, but reserved judgment on the issue of whether Plaintiffs were excused from performance due to an alleged material misrepresentation by Defendants. The court also reserved for trial the amount of Earn Out Consideration, if any, owed by Plaintiffs to Defendants, and adjudication of Defendants' libel counterclaim against Capax and Mr. Ragusa.

On April 19 and June 10, 2021, the court held a bench trial via videoconference with the parties' consent at which Michael McGrath, Thomas Thomson, Anthony Ragusa, Jessica Reed, Timothy Dibble, and John Baiocco appeared and testified.

Plaintiffs are represented by Robert Emmett Gallagher, Jr., Esq. Defendants are represented by Brian James Wheelin, Esq., Joseph L. Clasen, Esq., Sandra Marin Lautier, Esq., and Patrick W. Begos, Esq.

I.   **Findings of Fact.**

   A.   **The Parties.**

   1.      Alta is a private equity firm broadly focused on investing in lower middle market companies in a variety of industries. In 2014, it created AEP to acquire a company which provides, among other things, data governance solutions which AEP

---

[1] Plaintiffs have since withdrawn their claim for rescission.

later renamed Zovy. Zovy is a software company that offers products and services to support the compilation and storage of, among other things, voluminous data from email systems. At the time of its acquisition by Capax, Zovy was a small "software as a service" or "Saas" company with approximately thirty customers and less than ten employees.

2.     At all relevant times, Timothy Dibble and Jessica Reed were members of AEP, which owned 85 percent of Zovy.

3.     Christopher Grossman ("Mr. Grossman") was the Chief Executive Officer of Zovy from the time of its inception in 2014 until he resigned in October 2018.

4.     Mr. Grossman and other executives owned a minority ownership interest in Zovy through Zovy Management. Zovy Incentive also held a minority interest in Zovy to reward certain employees for their "sweat equity" contributions.

5.     On September 23, 2016, at the time of Capax's acquisition of Zovy, AEP, Zovy Incentive, and Zovy Management (the "Members") were Zovy's Members.

6.     At all relevant times, Anthony Ragusa a/k/a Tony Walker ("Mr. Ragusa") owned a majority share in Capax, while John Baiocco ("Mr. Baiocco") and Thomas Thomson ("Mr. Thomson") were minority partners in Capax.

7.     At all relevant times, Michael McGrath ("Mr. McGrath") was employed by Capax as either Chief Operating Officer, Chief Financial Officer, or Chief Performance Officer.

**B.     The EPA.**

8.     In or around June 2016, Mr. Grossman, on behalf of Zovy, contacted Mr. Baiocco, on behalf of Capax, to discuss a partnership between Capax and Zovy or, in the alternative, an acquisition of Zovy by Capax. At the time, Capax and Zovy were competitors in the data archiving field, although Capax provided on-site solutions while Zovy provided cloud-based solutions. Capax was interested in acquiring Zovy primarily because of Zovy's profitable contract with the United States Veterans Administration (the "VA").

9.     In anticipation of a potential acquisition, Zovy provided Capax with certain business records, contracts, and information, including a copy of an April 27, 2016 contract with Chicago Bridge & Iron ("CB&I") pursuant to which Zovy provided data migration and other services (the "CB&I Contract").

10.     On September 23, 2016, AEP, Zovy Management, Zovy Incentive, and Capax entered into the EPA whereby Capax acquired Zovy and assumed Zovy's liabilities. The closing date set forth in the EPA was September 23, 2016. Ex. 1 at 1.

11.     Pursuant to Sections 2.3 and 2.41 of the EPA, Capax acquired Zovy for one dollar plus "additional contingent consideration [the 'Earn Out Consideration'] of fifty percent [50%] of the annual gross . . . VA Revenue" in excess of $1 million for calendar years 2016 and 2017 and in excess of $1.5 million for calendar years 2018, 2019, and 2020. *Id.* at 5-6, §§ 2.3, 2.41 (internal quotation marks omitted) (brackets in original).

12.     "VA Revenue" is defined by the EPA as annual gross revenue actually received under VA contract number NNG15SD26B. Pursuant to the EPA, the Members were entitled to receive Earn Out Consideration payments within fifteen days of receipt of VA Revenue. To date, Capax has paid no Earn Out Consideration.

13.     Section 2.4.2.1 of the EPA states that "[f]rom the Closing Date to December 31, 2020 . . . (i) [Capax] shall cause [Zovy] to operate, or [Capax] shall operate itself or through another Affiliate, the Business in good faith[.]" *Id.* at 6, § 2.4.2.1.

14.     Under the EPA, the Members made certain representations and warranties including that they owned Zovy without any liens on their respective ownership interests; that Zovy was a limited liability company duly organized, validly existing, and in good standing; and that they had no conflicts that prevented their compliance with their obligations under the EPA. With regard to Zovy's finances, the Members made the following disclosures under the EPA:

> 5.8.   **Financial Statements**. Attached as Schedule 5.8 to the Disclosure Statement are true and complete copies of:

4

5.8.1.  the balance sheet of the Company, and the related combined statements of operations, members' equity and cash flows [together with the related notes] as of and for the years ended December 31, 2015 as internally reviewed [the "Internal Financial Statements"], and

5.8.2.  the unaudited balance sheets and the related statements of income as of and for the seven [7] month period ended July 31, 2016 [the "Interim Financial Statements"] [the Internal Financial Statements and the Interim Financial Statements, collectively, the "Financial Statements"].

5.8.3.  The Financial Statements fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations, cash flows, and members' equity for each of the periods then ended; have been prepared in accordance with GAAP in all material respects [subject, in the case of the Financial Statements, to normal recurring year-end adjustments and the absence of notes and other presentation items]; and have been prepared from and are consistent in all material respects with the books and records of the Company. Since December 31, 2015 there has been no change in any accounting [including Tax accounting] policies, practices or procedures of the Company.

5.9. **Absence of Undisclosed Liabilities.** The Company does not have any liabilities or obligations that would reasonably be expected to have a Material Adverse Effect on the Company, the Business or the assets of the Company, except those set forth or adequately reserved against on the balance sheets contained in the Financial Statements [or disclosed in the notes thereto], other than those incurred in the ordinary course of business and in a manner consistent with past practices and those not required to be reflected on a balance sheet in accordance with GAAP.

5.10. **No Material Adverse Change.** Since January 1, 2016, the Company has operated its business diligently and only in the ordinary course of business, and there has been no change in the business, operations, properties, assets, liabilities, commitments, earnings, financial condition of the Company that would reasonably be expected to have a Material Adverse Effect on the Company.

Ex. 1 at 12 (brackets in original).

15.     Other than the representations made in the EPA, the Members made no

other representation or warranties:

> 5.27.  **No Other Representations or Warranties.** Except as
> otherwise expressly set forth in Section 4 and Section 5 of
> this Agreement, neither any Member nor any Person on
> behalf of any Member has made any representations or
> warranties of any kind or nature, express or implied,
> including as to the accuracy or completeness of any
> information regarding the Company furnished or made
> available to the Purchaser or any of its Affiliates or their
> respective representatives, the condition, value or quality of
> the Business or the assets of the Company or the
> merchantability, usage, suitability or fitness for any particular
> purpose with respect to such assets or Business, or any part
> thereof, or as the workmanship thereof, or the absence of any
> defects therein, whether latent or patent.

*Id.* at 20.

16.     Section 8.2 of the EPA provides indemnification from the Members to

Capax for certain liabilities that were not assumed by Capax pursuant to the EPA:

> Subject to the limitations in Sections 8.1 through 8.10, each
> of the Members, severally and jointly, shall indemnify and
> hold harmless the Purchaser and the Company, and each of
> their principals, directors, officers, employees, agents,
> representatives, members, shareholders and controlling
> parties and all of their successors and assigns [each a
> "Purchaser Indemnified Person"] from and defend each of
> them from and against, and will pay each Purchaser
> Indemnified Person for, any and all damages, penalties, fines,
> costs, reasonable amounts paid in settlements, liabilities
> [including any liability which may arise under an alter ego, de
> facto control, de facto merger, successor, transferee or other
> similar theory or ground for liability], obligations, liens,
> losses, expenses [including interest], fees and court costs and
> reasonable attorney's fees and expenses, whether incurred in
> connection with any action, suit proceeding, hearing,
> investigation, charge, complaint, claim, demand, or order,
> with appropriate adjustment for insurance proceeds and third
> party recoveries which are actually received by the affected
> Party; whether or not involving a Third Party Claim

[collectively, the "Losses"] resulting from or arising out of or in connection with or relating to any of the following:

**8.2.1. any inaccuracy or breach of any representation or warranty of such Member contained in Articles IV or V;**

. . .

**8.2.4. any breach of any agreement, covenant or obligation of such Member contained herein; and**

8.2.5. any liability, obligation or responsibility of the Company or any Member for Taxes or withholdings arising out of the operation of the Company prior to the Closing Date.

*Id.* at 23 (brackets in original) (emphasis supplied).

17.     Pursuant to Section 8.9.2 of the EPA, "[e]xcept with respect to a breach by a Member of a Fundamental Representation, the aggregate liability of the Members under Section 8.2 shall not exceed $300,000 (as reduced by any reduction to the Earn Out Consideration under Section 2.5)[.]" *Id.* at 25, § 8.9.2.

18.     Section 8.3 of the EPA provides for indemnification by Capax of the Members in the following circumstances:

[Capax] shall indemnify and hold harmless the Members and each of their principals, directors, officers, employees, agents, representatives, members, managers, shareholders and controlling parties and all of their successors and assigns [each a "Member Indemnified Person"], and defend each of them from and against, and will pay each Member Indemnified Person for, any and all Losses resulting from and arising out of or in connection with or relating to any of the following:

8.3.1. any inaccuracy or breach of any representation or warranty of the Purchaser contained in Article VI;

**8.3.2. any breach of any agreement, covenant or obligation of the [Capax] contained herein; and**

8.3.3. any and all Losses arising from or relating to the operation of the Business or the Company following the Closing Date.

*Id.* at 23-24 (brackets in original) (emphasis supplied).

19.     The EPA contains a merger clause which provides:

> This Agreement, including the Disclosure Statement
> schedules and exhibits hereto, and the instruments and other
> documents delivered pursuant to this Agreement, contain the
> entire understanding and agreement of the parties relating to
> the subject matter hereof and supersedes all prior and/or
> contemporaneous understandings and agreements of any kind
> and nature [whether written or oral] among the parties with
> respect to such subject matter, all of which are merged herein.

*Id.* at 26, § 9.4 (brackets in original).

20.     The EPA is governed by New York law. *See* Ex. 1 at 27, § 9.7.

**C.     Capax Performed Limited Due Diligence Prior its Acquisition of Zovy.**

21.     Although Mr. McGrath testified that Capax performed due diligence prior to its acquisition of Zovy, the court found his testimony only partially credible. Capax's representatives reviewed the disclosures and other information provided to it by Defendants, but they requested little additional information. Instead, as Mr. Ragusa stated in an email:

> Although we think we know what we are getting, this is still a
> shot in the dark. The reason we accelerated the closing
> process without due diligence is because of the immediate
> cash flow benefit we expect to receive over the next 60 days,
> especially from the VA.

Ex. 14 at 1. Whether Capax performed due diligence does not resolve the issue of whether the Members materially breached the EPA. It is, however, relevant to the issue of credibility.

**D.     HP Costs Owed by Zovy Related to the CB&I Contract.**

22.     As noted, Section 5.9 of the EPA states that "[Zovy] does not have any liabilities or obligations that would reasonably be expected to have a Material Adverse Effect on [Zovy], the [b]usiness, or the assets of [Zovy], except those set forth or adequately reserved against on the balance sheets contained in the Financial Statements[.]" Ex. 1 at 12, § 5.9.

23.     Prior to the Acquisition, Capax received a copy of the CB&I Contract which had a total price of $1,375,000. *See* Ex. 20.

24.     The CB&I Contract references certain associated HP costs as follows:

- The Total Price represents the full cost of the Project, meaning that it is a fixed, lump sum price regardless of extended project timelines or difficulties with HP or its software, and includes all Hardware, Software, Services, Travel, **HP costs** and expenses required for the Project.

    . . .

- Zovy shall, based upon Zovy's existing, separate agreement with HP, ensure that CB&I shall no longer be contractually or otherwise obligated to pay to HP any fees not already accrued, including, without limitation, any further fees for Data Safe Archiving Services, Data Deletion Services, Data Migration Services, Data Restoration Services, or Data Return Services, unless such agreement is entered into between CB&I and HP after this Proposal is executed.

*Id.* (emphasis supplied).

25.     Mr. Grossman estimated that there would be $675,000 in HP costs relative to the CB&I Contract. (Doc. 115 at 156-57.) On July 29, 2016 and August 3, 2016, he e-mailed Mr. Baiocco financial statements containing monthly projected profit and loss statements for the period of June 2016 through December 2016 in which the HP costs for the CB&I Contract were disclosed. Exs. 20, 21; *see also* Doc. 115 at 154-59.

26.     In those projection statements, "Software, Data Center Infrastructure" costs increased from $142,533.47 in July 2016 to $198,783.47 in August 2016, an increase of $56,250, representing HP costs related to the CB&I Contract. The increase of $56,250 per month represents the $675,000 annual cost expected. Zovy projected these costs to start in August 2016. *Id.*

27.     Zovy received HP invoices related to CB&I Contract which were included as part of an Accounts Payable statement provided to Capax prior to the Acquisition referencing "Hewlett-Packard - $63,368.67." (Doc. 115 at 160-61); Ex. 18 (last page A/P Aging Summary).

28.     Capax claims that it incurred undisclosed obligations to HP on behalf of CB&I because of a contract between HP and CB&I to which Zovy was not a party. It contends that this contract should have been disclosed in the Material Contracts

Schedule.[2] The CB&I Contract, however, was disclosed in the Material Contracts Schedule. *See* Ex. 2 at 17. Plaintiffs did not provide any evidence substantiating the existence of a separate contract between HP and CB&I or the factual or legal basis for its contention that it was required to pay HP pursuant to such a contract. While Plaintiffs assert that their expert witness, Kelly Besaw, created a report (Doc. 128-2) that identified this alleged contract and liability, Mr. Besaw did not testify at trial and his report was not introduced into evidence.[3] Capax's allegation that the Members failed to disclose the existence of a separate contract between HP and CB&I is thus uncorroborated and not credible.

29.     Although Mr. Ragusa testified that Capax incurred a $1.628 million liability as a result of the HP Costs but was able to "negotiate[] a settlement with HP[,]" (Doc. 126 at 121, line 14), Capax provided no evidence of this liability, demands for payment from HP, or any payment or settlement by Capax. Mr. Ragusa's testimony on this point was not credible in the absence of any corroborating evidence. It is also simply not credible that a sophisticated corporation such as Capax would settle a sizable million-dollar-plus liability with no evidence of a settlement agreement, a release, or payment.

30.     Prior to its acquisition of Zovy, Capax did not seek further information regarding the CB&I Contract or any related disclosures. *See* Doc. 115 at 153, 159, 161. Although it claims that it discovered the allegedly undisclosed HP liability in October 2016, it did not raise this alleged liability with Defendants until January 2017, after it failed to pay Earn Out Consideration when due. *See id.* at 95-96.

---

[2] The EPA defines a "Material Contract" as a contract "with an annual expense to the Company of more the Five Thousand U.S. Dollars [$5,000.00] or with a one-time cost to the Company of more than Seven Thousand Five Hundred U.S. Dollars [$7,500.00] or/and an annual receipt by the Company of at least One Hundred Thousand U.S. Dollars [$100,000.00] [collectively with all the Company's client Contracts, the 'Material Contracts']." Ex. 1 at 17-18, § 5.16 (brackets in original).

[3] In their Proposed Findings of Fact and Conclusions of Law (Doc. 129), Plaintiffs cite to several exhibits that were neither exhibits on summary judgment nor introduced into evidence at trial, including Mr. Beshaw's report which does not include a copy of the alleged separate contract between HP and CB&I or any evidence of a payment or settlement of that alleged liability by Capax. *See* Doc. 128-2.

31.     The Members adequately disclosed the HP costs associated with the CB&I Contract and made no material misrepresentations as part of this disclosure. Capax has thus failed to establish by a preponderance of the evidence a material breach of the EPA by the Members which would excuse its obligation to pay the Earn Out Consideration due under the EPA.

### E.     The Earn Out Consideration.

32.     Thundercat Technologies, LLC ("Thundercat") contracted with the VA as an approved contractor to provide SaaS services through Zovy. Thundercat was responsible for paying Zovy's VA invoices when they became due. The VA typically paid most of its invoices at the end of the year when it renewed its contracts.

33.     After it acquired Zovy, Capax received "VA Revenue" as defined by the EPA as follows:

| Date | Amount of VA Revenue |
|------|----------------------|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| March 23, 2018 | $325,000 |

Ex. 3; *see also* Doc. 115 at 23. Mr. McGrath acknowledged the accuracy of these amounts.

34.     Per Section 2.4.2 of the EPA, the Members were first entitled to Earn Out Consideration on December 3, 2016. Ex. 1 at 6, § 2.4.2; Ex. 6.

### F.     Capax's Delay of Invoices to Reduce the Earn Out Consideration.

35.     On November 21, 2016, Mr. McGrath emailed Mr. Baiocco and Mr. Grossman, advising them that $177,396 of Earn Out Consideration was owed to the Members. In doing so, Mr. McGrath raised no concerns regarding the accuracy of the

11

Members' representations in the EPA and raised no issues with the accuracy of the Members' financial disclosures.

36.     On November 30, 2016, Mr. McGrath informed Mr. Baiocco that he intended to make sure that Thundercat did not pay a $770,000 invoice until 1/1/2017 to "start the clock on the earn out again" because Capax wanted to "mess with Alta[.]" Ex. 7.

37.     Mr. McGrath had no legitimate business reason for delaying payment by Thundercat. Instead, the sole purpose was to reduce the Earn Out Consideration due to the Members. Mr. McGrath's testimony that the delay was motivated by a tax-related reason and a desire to correct a purchase order was not credible.

38.     On December 12, 2016, Mr. McGrath asked Alexandra MacMurchie to "ensure we don't get paid until 2017" by Thundercat for the $770,000 invoice (1098) that was dated December 2, 2016, and was "ready to send[.]" Ex. 8. Mr. McGrath instructed an accountant to not deposit any monies received from Thundercat until they spoke further.

39.     Thundercat did not pay Zovy until January 13, 2017, which in turn, impacted the amount of Earn Out Consideration due to the Members.

40.     On December 20, 2017, Thundercat contacted Capax regarding a second $770,000 invoice, stating: "Please send the invoice for TCAT PO 12968 today. Support renewed on 12/02/2017. We need to invoice the VA ASAP, but can't until your invoice is received." Ex. 11 at 1. Mr. Grossman forwarded the email to Mr. McGrath and stated that Capax had "spoken to [Thundercat] about the timing of the invoices." *Id.* The invoice was not sent to Thundercat until January 2, 2018. A Thundercat employee emailed Krista Glownia, a Capax employee, and stated: "Please note that although this invoice is dated 12/7/17, we did not receive the invoice until 1/2/18. As a result, the invoice due date will be net 30 from yesterday, the date of receipt of the invoice." Ex. 13 at 1. Thundercat did not pay the invoice until January 12, 2018. This, too, was a deliberate and successful effort by Capax to delay payments so as to reduce the Earn Out Consideration it would owe the Members under the EPA.

41.     Capax, Mr. McGrath, and Mr. Ragusa acted in bad faith and in violation of Section 2.4.2.1 of the EPA by intentionally delaying payment of VA Revenue and thereby reducing the Earn Out Consideration through manipulation of Thundercat invoices.

42.     If the two $770,000 VA payments from Thundercat were not delayed, the Members would have received the following Earn Out Consideration:

| **2016 VA Revenue** | |
|---|---|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| Total | $2,124,792 |
| **50% Earn Out over $1 million cap** | **$562,396** |
| **2017 VA Revenue** | |
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| Total | $1,885,992 |
| **50% Earn Out over $1 million cap** | **$442,996** |
| **2018 VA Revenue** | |
| March 23, 2018 | $325,000 |
| **50% Earn Out over $1.5 million cap** | **$0** |
| **Total Earn Out** | **$1,005,392** |

43.     Mr. Ragusa has stated: "[W]e're willing to pay the VA earn out at whatever calculation Alta agrees to based on the poor wording of the agreement." (Doc. 125 at 83.) Plaintiffs further concede that "Capax had every intention of paying what was accurately owed on the VA earn-out. To be clear, Capax never disputed the validity of the VA earnout." (Doc. 129 at 8) (emphasis omitted).

44.     Capax had both the net income and gross profits to pay the total Earn Out Consideration when due[4] but chose not to pay it in bad faith.

### G.     The Fraud Alert.

45.     On or around July 24, 2018, in an effort to gain leverage in this litigation and/or settlement negotiations with Defendants, Mr. Ragusa disseminated a "Fraud Alert" using his LinkedIn account to between ten and twelve businesses listed on Alta's website as companies that do business with Alta. Exs. 22 & 23 (collectively the "Fraud Alert").

46.     The Fraud Alert included quotations from the pleadings in this case as well as the following statements:

**Timothy Dibble and Jessica Reed remain personally liable for fraud.**

We are continuing to investigate allegations regarding Timothy Dibble and Jessica Reed, who were named personally for fraud in Capax Discovery's complaint. Although Dibble and Reed attempted to have themselves personally removed from the complaint, the judge denied their request. They remain personally as a defendant with no corporate shield to protect them from their role in this alleged fraud.

Chances are you may well be a victim of fraud.

Ex. 22 (emphasis in original).

47.     Four of the businesses that received the Fraud Alert (Reach Analytics, Greenwood, Structural Graphics, and 1105) reached out to Alta, informed it of the communication, and raised concerns about the Fraud Alert's contents.

48.     Alta sent Mr. Ragusa a cease and desist letter demanding, among other things, a retraction of the Fraud Alert. Ex. 24.

49.     Mr. Ragusa neither took action in response to the cease and desist letter nor made any effort to correct or retract the information in the Fraud Alert.

---

[4] From the date of acquisition (September 23, 2016) to the end of 2016, Zovy had a gross profit of $1,226,605 and net income of $973,451. In 2017, Zovy had a gross profit of $3,202,330, net income of $1,473,545, and distributed $2,446,996 to its members. Zovy's 2017 Partnership Tax Return reflected gross receipts of over $5.6 million and ordinary business income of $1,763,732. On May 5, 2017, Mr. Ragusa valued Zovy at a range of $27 million to $60 million. Zovy was also profitable in 2018.

50. Both Ms. Reed and Mr. Dibble credibly testified that their reputation for honesty and integrity are important to their careers and that any false information impugning their reputations causes them emotional distress and reputational harm.

## II.  Conclusions of Law and Analysis.

### A.  Defendants' Breach of Contract Counterclaim.

The remaining issues relating to Defendants' breach of contract counterclaim are as follows: (i) whether Capax is entitled to be excused from performance under the EPA due to the alleged material misrepresentation regarding the disclosure of a liability to HP related to the CB&I Contract; (ii) the calculation of the Earn Out Consideration owed; and (iii) if Earn Out Consideration is owed, the amount of prejudgment interest and attorneys' fees that should be awarded.

#### 1.  Whether Capax's Performance is Excused.

"[P]erformance under a contract is excused" only where the other party "has committed a material breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). A material breach is one that goes "to the root of the agreement[.]" *Id.* (internal quotation marks omitted). Capax alleges that the Members materially breached Section 5.9 of the EPA by failing to disclose an alleged $1.628 million liability owed to HP, and that Capax is therefore excused from all performance under the EPA. This claim is without merit.

Capax received a copy of the CB&I Contract prior to its acquisition of Zovy which explicitly stated that Zovy would be responsible for "HP costs[,]" and would ensure that CB&I would not be contractually liable for additional HP fees not already accrued. Ex. 20. The estimated $675,000 in HP costs was disclosed to Capax prior to acquisition as a projected increased cost reflected on a financial statement provided to Capax on July 29, 2016. The financial statement shows an increase in "Software, Data Center Infrastructure" costs from $142,533.47 to $198,783.47 beginning in August, 2016. This increase of $56,250 per month represented the expected annual cost of $675,000. Ms. Reed credibly testified that invoices that Zovy received related to the HP liability were included on an Accounts Payable Summary provided to Capax prior to acquisition.

Capax received these disclosures and did not seek further information regarding them or the CB&I Contract. It proffered no evidence beyond the testimony of Mr. Ragusa that it had incurred a $1.628 million liability, or that such a liability had been paid by it or settled for a lesser amount. Indeed, it provided no evidence of an undisclosed contract between HP and CB&I obligating Zovy to make payments to HP on CB&I's behalf. There is thus a wholesale failure of proof regarding the alleged undisclosed liability.

Based on the foregoing, the court finds that the Members adequately disclosed their obligations pursuant to Section 5.9 of the EPA and thus did not materially breach the EPA. Plaintiffs are therefore not excused from performance under the EPA and must pay in full the Earn Out Consideration.

### 2.    The Amount of the Earn Out Consideration Owed.

Zovy received VA Revenue as defined in the EPA on the following dates as depicted on a Thundercat spreadsheet admitted into evidence as Ex. 3:

| Date | Amount of VA Revenue |
| --- | --- |
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| March 23, 2018 | $325,000 |

Ex. 3. Mr. McGrath acknowledged that these amounts were received both at his deposition as Capax's Rule 30(b)(6) witness and at trial.

Capax intentionally delayed the receipt of the January 13, 2017 payment and receipt of the January 12, 2018 payment in bad faith in order to reduce the amount of Earn Out Consideration owed to the Members. Capax's conduct is a breach of Section 2.4.2.1 of the EPA which required Capax to operate the Zovy business "in good faith" throughout the five-year Earn Out period. Ex. 1 at 6, § 2.4.2.1(i). It also violates the

implied covenant of good faith and fair dealing in the EPA. *See Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp.2d 290, 298-99 (S.D.N.Y. 2012) (explaining that "[u]nder New York law, there is a covenant of good faith and fair dealing implied in all contracts" which "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract") (internal quotation marks and citation omitted).

Although the EPA calls for the Earn Out Consideration to be calculated using the dates VA Revenue is "actually received[,]" Earn Out Consideration based on VA Revenue was required to reflect the ordinary course of dealings between Zovy and Thundercat, *id.* at 6, § 2.4.1, and should not reflect an intentional delay of those payments for the sole purpose of reducing the Earn Out Consideration. The Members are therefore entitled to Earn Out Consideration under the EPA as follows:

### 2016 VA Revenue

| | |
|---|---|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| Total | $2,124,792 |
| **50% Earn Out over $1 million cap** | **$562,396** |

### 2017 VA Revenue

| | |
|---|---|
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| Total | $1,885,992 |
| **50% Earn Out over $1 million cap** | **$442,996** |

### 2018 VA Revenue

| | |
|---|---|
| March 23, 2018 | $325,000 |
| **50% Earn Out over $1.5 million cap** | **$0** |
| **Total Earn Out Consideration** | **$1,005,392** |

### 3.    Prejudgment Interest.

Because the EPA is governed by New York law, under CPLR § 5001(b), "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR § 5001(b). Under CPLR § 5004, Defendants are entitled to 9% prejudgment interest per annum. *See* CPLR § 5004.

Earn Out Consideration payments were due within fifteen days of the close of each calendar year. *See* Ex. 1 at 6, § 2.4.2. Using January 16, 2017 for the 2016 Earn Out Consideration and January 16, 2018 for the 2017 Earn Out Consideration, the court awards prejudgment interest as follows:

#### 2016 VA Revenue

| | |
|---|---|
| October 28, 2016 | $1,000,000 |
| November 17, 2016 | $354,792 |
| January 13, 2017 | $770,000 |
| Total | $2,124,792 |

**50% Earn Out over $1 million cap        $562,396**

Time period for prejudgment interest (January 16, 2017 through August 31, 2021 = 1688 days or 4.62 years)

Prejudgment interest = $562,396 × .09 × 4.62 = **$233,844**

Per diem interest = $138.53

#### 2017 VA Revenue

| | |
|---|---|
| April 6, 2017 | $338,000 |
| October 20, 2017 | $500,000 |
| December 14, 2017 | $277,992 |
| January 12, 2018 | $770,000 |
| Total | $1,885,992 |

**50% Earn Out over $1 million cap        $442,996**

Time period for prejudgment interest (January 16, 2018 through August 31, 2021 = 1323 days or 3.62 years)

Prejudgment interest = $442,996 × .09 × 3.62 = **$144,328**

Per diem interest = $109.09

| | |
|---|---|
| **Total Earn Out** | **$1,005,392** |
| **Total Prejudgment Interest** | **$378,172** |
| **Total Amount Due** | **$1,383,564** |

The court hereby enters judgment in favor of the Members and against Plaintiffs in the amount of $1,383,564.

### 4.      Reasonable Attorneys' Fees and Expenses.

Pursuant to Section 8.3.2 of the EPA, Capax agreed to indemnify and hold harmless the Members and their principals, directors, officers, and others from their reasonable attorneys' fees and expenses relative to "any breach of any agreement, covenant or obligation of [Capax] contained" in the EPA. Ex. 1 at 23-24, § 8.3.2. The Members seek to address the issue of attorneys' fees through a filing of a Fed. R. Civ. P. 54(d)(2) motion in the event that the court determined that the Earn Out Consideration was owed. The Members may seek reasonable attorneys' fees under Section 8.3.2 of the EPA through the filing of a Fed. R. Civ. P. 54(d)(2) motion.

### B.      Defendants' Libel Counterclaim.

To prevail on a libel claim under New York law, a plaintiff must show: "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability." *Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014). The Fraud Alert contains the statements "Timothy Dibble and Jessica Reed remain personally liable for fraud" and "[t]hey remain personally as a defendant with no corporate shield to protect them from their role in this alleged fraud." Ex. 22. These statements indicate to the average reader that Mr. Dibble and Ms. Reed had been adjudicated personally legally responsible for an alleged fraud with no corporate shield to protect them when no such determination had been made.

Mr. Ragusa sent the Fraud Alert to several businesses listed on Alta's website and at least four businesses reached out to Alta regarding the Fraud Alert. In its Summary Judgment Decision, the court noted that Defendants "admit that they 'are not aware of, to

date, a specific lost business opportunity as a result of the Fraud Alert[,]'" and therefore held that they could not establish special damages. (Doc. 97 at 33.) However, because this case involves "not only a private-figure plaintiff, but also speech of purely private concern[,]" nominal damages for libel per se are recoverable and do not require a showing of malice. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774 (1986) (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 751-52 (1985)).

Based on the foregoing, the court finds that the Fraud Alert's statements regarding personal liability of Mr. Dibble and Ms. Reed "imput[ed] to [them] . . . fraud, dishonesty, [or] misconduct," rendering them per se defamatory. *Lee v. Jarecki*, 2019 WL 948881, at *12 (S.D.N.Y. Feb. 14, 2019) (quoting *Four Star Stage Lighting, Inc. v. Merrick*, 392 N.Y.S.2d 297, 298 (N.Y. App. Div. 1977)). The court therefore awards Defendants Reed and Dibble nominal damages in the amount of $100.00 each.

Defendants further seek an award of punitive damages, however, they made no such request in their counterclaim. "Under New York law, punitive damages in a defamation case are justified 'to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights.'" *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005) (quoting *Prozeralik v. Cap. Cities Commc'ns., Inc.*, 626 N.E.2d 34, 42 (N.Y. 1993)). Although a close question, the court finds that Mr. Ragusa's conduct does not rise to the level of "outrageous conduct" required for an award of punitive damages. In particular, the court finds that although there was no legitimate business reason for the Fraud Alert, it is primarily devoted to a summary of court proceedings as opposed to misrepresentations of fact regarding Mr. Dibble's and Ms. Reed's conduct. The only defamatory statement related to those individuals is the Fraud Alert's statement that the court had denied their requests to dismiss the complaint against them and that they remain personally liable for fraud. Although the "sting" of this statement is that the court found Mr. Dibble and Ms. Reed personally liable for fraud, which it did not, the court had in fact denied Mr. Dibble's and Ms. Reed's requests to be dismissed from this lawsuit. Against this backdrop, a Fraud Alert that caused no special damages and no discernible reputational harm does not warrant an award of punitive

damages when no such request is contained in Defendants' counterclaim.[5] Defendants' request for punitive damages is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court enters judgment in favor of the Members on their breach of contract counterclaim in the amount of $1,383,564 and in favor of Defendants Reed and Dibble on their libel counterclaim in the amount of $100 each. Defendants may file a request for attorneys' fees in accordance with Fed. R. Civ. P. 54(d) within fourteen (14) days of this judgment.

SO ORDERED.

Dated this 31st day of August, 2021.

Christina Reiss, District Judge
United States District Court

---

[5] The court does not deny Defendants' request for punitive damages solely on the ground that Defendants failed to request this relief in their counterclaim. *See Griffith Lab'ys U.S.A., Inc. v. Pomper*, 607 F. Supp. 999, 1001 (S.D.N.Y. 1985) (holding that a plaintiff's "failure to plead punitive damages does not bar such an award" because Rule 54(c) "has been construed to permit the award of punitive damages when a complaint did not separately plead for them but did allege facts sufficient to support a punitive damages award").